[File No. 6219.]

FORD MOTOR COMPANY, a Corporation, Respondent, v. STATE
OF NORTH DAKOTA, Appellant.

(258 N. W. 596.)

Opinion filed January 7, 1935.

*Arthur J. Gronna,* Attorney General, and *Harold D. Shaft,* Assistant Attorney General, for appellant.

318

*O'Hare, Cox & Cox,* for respondent.

CHRISTIANSON, J.   The plaintiff, a Delaware corporation, brought this action against the state of North Dakota, the state tax commissioner and the state auditor for the purpose of recovering $55,580.58, which it is alleged plaintiff paid in excess of the income tax actually and legally due from it to the state of North Dakota for the years 1921 and 1922.   The action is the result of a difference of opinion between the plaintiff and the then tax commissioner of North Dakota as to the proper basis of allocating or computing plaintiff's income for taxation.

It is alleged in the complaint that the plaintiff made due returns and paid its income tax for the years 1921 and 1922 but that the tax commissioner in 1923 made an additional assessment against the plaintiff for the years 1921 and 1922 aggregating $55,580.58 and that plaintiff "on or about July 16, 1923, involuntarily and for the purpose of avoiding penalties and forfeitures and as a result of the demand of the tax commissioner paid the said sum to the treasurer of the state of North Dakota under written protest."   It is further alleged that the plaintiff made due demand for a refund of said moneys but that no action was taken by the tax commissioner; that thereafter and on or about January, 1929, plaintiff made a further demand in writing upon the tax commissioner for a refund of said sum and that on January 23, 1929, the then tax commissioner in writing formally approved the application; that on April 5, 1929, the plaintiff filed with the state auditor such demand for payment and that the same was rejected by the state auditing board on April 5, 1929.   This action was instituted April 8, 1929. The defendant demurred to the complaint on the grounds: (1) That the complaint did not state facts sufficient to constitute a cause of action;

and (2) that the court had no jurisdiction over the defendants or the subject-matter of the action.

The district court sustained the demurrer as to the defendants, the state auditor and the tax commissioner but overruled it as to the state of North Dakota. The state appealed to this court and contended that the complaint failed to state a cause of action and that the court had no jurisdiction over the state of North Dakota or the subject-matter involved because: (1) The state had not consented to be sued upon a cause of action such as that set forth in the complaint; and (2) that the statute under which the tax in question was imposed and collected, prescribed a remedy whereby a taxpayer could obtain a refund of any income taxes illegally collected by the state; that the remedy so prescribed is exclusive and that the plaintiff having failed to pursue it may not maintain an action.

Neither contention was sustained. This court held that an action for moneys had and received will lie against the state under § 8175, Comp. Laws 1913, and that the statutory remedy whereby a taxpayer might obtain a refund for income taxes illegally collected did not apply to the payments in question here. Ford Motor Co. v. State, 59 N. D. 792, 231 N. W. 883.

After the case was remanded to the trial court the defendant interposed an answer. The case came on for trial and resulted in findings and conclusions in favor of the plaintiff. Judgment was entered accordingly and the defendant has appealed. There is no dispute in the evidence. The controversy ultimately resolves itself into questions of law. The sections of the state income tax law (Session Laws 1919, chap. 224) that need to be considered in determining the controversy are these:

"Sec. 10. (a) There shall be levied, assessed, collected and paid annually upon the total net income received in the preceding calendar year from all sources by every corporation, joint-stock company or association organized in the state, no matter how created or organized, a tax of 3 per cent upon such total net income; and a like tax shall be levied, assessed, collected and paid upon the total net income received from all sources within the state by every corporation, joint-stock company or association organized or existing under the laws of any other state, the United States, or a foreign country. . . ."

"(c) When the income of any corporation, whether domestic or foreign, is derived from any business conducted partly within and partly without the state, the tax shall apply to that portion of the total net income which the business within the state bears to the total business within and without the state; and where such business within the state is not otherwise more easily and certainly separable from such total business within and without the state, business within the state shall be held to mean that proportion of the total business within and without the state which the property of such corporation within the state bears to its entire property employed in such business within and without the state. . . ."

"Sec. 12. . . . Fourth . . . (b) In the case of a corporation, joint-stock company or association organized, authorized or existing under the laws of another state, the United States, or a foreign country, the net income subject to the tax herein imposed shall be ascertained by deducting from its total net income from all sources: First. All income derived from sources without the state; Second. All the items enumerated under subsection (a) of this section, as applied to the business or property of any such corporation, joint-stock company or association within the state. . . ."

"Sec. 14. (a) The Commissioner shall make all assessments upon corporations, joint-stock companies, or associations subject to any tax hereunder, on or before the first day of May of each year, and shall certify the amount of the tax in each case to the State Treasurer on or before the first day of June following. On or before the fifteenth day of July the Treasurer shall make demand upon each such corporation, joint-stock company or association for the amount of the tax due as certified, and said tax shall be paid within ten days thereafter; provided, that any corporation, joint-stock company or association computing taxes upon the income of its fiscal year when such fiscal year does not correspond with the calendar year shall pay the taxes due under its assessment within one hundred and five days after the date upon which it is required to file its list or return of income for assessment, except in cases of refusal or neglect to make such return and in cases of erroneous, false or fraudulent returns in which cases the Commissioner upon discovery thereof, shall at any time within three years after such return is due make a return upon information obtained as pro-

vided for in this Act or by existing law; and the assessment made by the Commissioner thereon shall be paid by such corporation, joint-stock company or association immediately upon the notification of the amount of such assessment, and to any sum or sums due and unpaid after the 15th day of June in any year, or after one hundred and five days after the date on which the return of income is required to be made by the taxpayer, and after ten days' notice and demand thereof by the Treasurer, there shall be added a sum of five per cent on the amount of the tax unpaid and interest at the rate of one per cent per month upon said tax from the time the same became due, which additional sum shall be added to the unpaid tax, demanded and collected as herein provided for the tax itself."

"Sec. 19. All taxes upon corporations, joint-stock companies, or associations provided for by this Act shall be assessed by the State Tax Commissioner and collected by the State Treasurer. . . ."

"Sec. 22. The Commissioner shall require every return to be verified by the oath of the party rendering it. If the Commissioner have reasons to believe that the amount of any income returned is understated, he shall give due notice to the person making the return to show cause why the amount of such return should not be increased, and upon proof that the amount has been understated, he may increase the same accordingly. Such person may furnish sworn testimony to prove any relevant facts, and on application shall be given a formal hearing by the Commissioner, and if dissatisfied with the ruling of the Commissioner, may appeal to the State Board of Equalization."

"Sec. 27. No provision contained in this Act shall be construed as an attempt to impose a burden upon Interstate Commerce, or to tax the income of any individual or non-resident corporation derived from sources wholly without the state; but the income of any individual, corporation, joint-stock company or association subject to the provisions of this Act, derived from business conducted partly within and partly without the state, is taxable in that proportion which the business within the state bears to the entire business within and without the state; and where such business within the state is not otherwise more easily and certainly separable from such business without the state, business within the state shall be held to mean such proportion of the total business within and without the state as the property of such individual or

corporation engaged in such business within the state bears to its entire property so engaged within and without the state. . . ."

It will be noted that the statute provides two modes for ascertaining the income tax to be paid by a corporation whose income is derived from a business conducted partly within and partly without the state, to-wit: (1) A separation of the business within the state from the total business of the corporation both within and without the state, and computation of the tax on that portion of the total net income which the business within the state bears to the total business both within and without the state; and (2) where "such business within the state is not otherwise more easily and certainly separable from such total business within and without the state," then for the purpose of computing the income tax the "business within the state shall be held to mean that proportion of the total business within and without the state which the property of such corporation within the state bears to its entire property employed in such business within and without the state."

Plaintiff paid its income tax for the year 1921 on the theory that the second mode of computing the tax was applicable. The record discloses that such payment was made to the state treasurer in July, 1921. The payment was accepted, and there is no contention that the payment so made was not the full amount of income taxes due for that year, if such tax was computable according to the mode which the plaintiff applied. Plaintiff, also, made a return for 1922. There is no claim that the amount of its total income and the amount of its property employed in its entire business, both within and without the state, were not accurately reported by the plaintiff in its returns to the tax commissioner.

A change occurred in the personnel of the State Tax Commissioner in 1922.

On April 30, 1923, the then Tax Commissioner wrote the plaintiff corporation a letter, wherein he said, in part:

"On April 10th we wrote you in regard to your claim for refund on your 1921 North Dakota state income tax. At that time we called your attention to the fact that the property basis was not, in our opinion, a fair basis for you to use in apportioning your net income to North Dakota due to the fact that you had very little property in the state as compared to the business which you carry on in the state.

"We are now auditing the 1922 returns and find that you again apportioned your net income to North Dakota on a property basis. We have consulted your 1919 and 1920 reports filed in this office and find that in both of these years you were able to report to us the amount of business conducted in North Dakota. . . . Since we have no subsequent figures to base a proportion upon, and the presumption being that your business in North Dakota has expanded in about the same proportion as your business generally, we have taken this proportion and applied it to your 1921 and 1922 net incomes. The results are as follows : . . .

"The amounts as above set out will be certified to the state treasurer as due from the Ford Motor Company on or before May 20th. If you have any additional figures to submit in regard to these taxes, they should be submitted to us at once."

The plaintiff replied to this letter on May 10th. (The letter is not in evidence.)

On May 14, 1923, the State Tax Commissioner wrote the plaintiff as follows :

"We are in receipt of your letter of May 10th with further reference to your 1921 and 1922 income tax assessments.

"In this letter you state you believe the property basis of apportionment entirely fair to this state. In this we do not agree with you and do not feel that we can make your assessment upon this basis. *We have decided to make your assessment upon the basis of apportioning to North Dakota that proportion of your entire net income which your North Dakota sales bear to your entire sales.* In making our assessment, we have used the figures furnished in your 1920 blank as to what this proportion amounts to. However, if you have any later figures to furnish along this line as to the amount of your sales in North Dakota, we will be glad to revise the proportion if you will forward us such figures.

"In your letter you have included in business transacted, your total sales, material purchased, cost of manufacturing, etc. Under the rulings of this department, the word 'business' in the 1919 law has been construed to mean sales only. We have your total sales for the years 1921 and 1922, but do not have your North Dakota sales."

On July 6, 1923, the plaintiff wrote the state treasurer a letter from which we quote:

"We enclose herewith check number C–58384 for $15,854.61 in payment of the additional tax assessed against us for the year 1921 and check number C–58383 for $44,103.04 in payment of your tax assessment for the year 1922, as per your statements dated June 11, 1923, covering North Dakota Corporation Income Tax.

"The Ford Motor Company in making payment of the tax assessments as set out above does so under protest and contends that the payments as made are under duress and compulsion, and are made solely to avoid the imposition of penalties and forfeitures as is prescribed by Act for non-payment or delinquent payment of the amounts claimed under the provisions thereof.

"The Ford Motor Company in making these payments under protest contends that the manner of computing said tax is erroneous in that said computation was made on income for the years 1921 and 1922 upon the same percentage basis as was income for the year 1920. It is contended by this taxpayer that this method of computation is gross error in law in that a fictitious result was attained by using a percentage arrived at by allocation of the gross earnings of the Ford Motor Company within the State of North Dakota to the gross earnings of said company in total and applying the result to the income for 1921 and 1922 for a determination of the amount of tax claimed to be due upon the returns filed for the years as above mentioned.

"The Ford Motor Company in further protest to the payment of the tax claimed to be due contends that the method of computation used in arriving at the amount of tax assessed against the said Ford Motor Company is unjust, unwarranted and is not in accordance with the law as is set out in Income Tax Law of North Dakota. . . .

"The Ford Motor Company further asserts its intention to waive no legal right it may have to enforce the refund of the amount which it has paid or shall pay in accordance with the assessment claimed to have been made under the provisions of said Act and reserves the right to take such action as may be necessary or proper when and as provided by law to recover any and all amounts paid by or for it under the assessments claimed to have been made under the provisions of said Act."

This letter, together with the checks mentioned therein, were transmitted to the state treasurer, and the state treasurer issued receipts dated July 16, 1923, for the payments made by the checks. Each of these receipts bore the notation "Paid under protest."

It appears that about the time the tax commissioner made the additional assessments against the plaintiff here, he made additional assessments on the same theory and on the same basis against the Standard Oil Company of Indiana and that the latter company brought action in the district court of the United States to enjoin the collection of the tax. That action was determined in November, 1924, and resulted in a decision holding that the method of computing income tax adopted by the state tax commissioner was contrary to law and the collection of the tax was enjoined. The state appealed from the decision and the circuit court of appeals rendered a decision on May 10, 1926, affirming the judgment of the lower court. Fisher v. Standard Oil Co. (C. C. A. 8th) 12 F. (2d) 744. In that litigation the Standard Oil Company was represented by the same counsel who appear for the plaintiff here. It appears that it was tacitly understood between counsel for the plaintiff and the then tax commissioner that the controversy between the plaintiff and the state, involved in this suit, should be held in abeyance until the action brought by the Standard Oil Company had been determined. On April 25, 1927, plaintiff made formal application for a refund. Such application apparently was neither approved nor rejected; but from what is said in certain correspondence it seems that the tax commissioner called plaintiff's attention to the fact that there were not at his disposal sufficient funds with which to pay plaintiff's claim if payment were approved and that payment could be made only if and when the legislative assembly made provision therefor. Later the plaintiff filed another claim reciting at some length the steps leading up to the payment of the tax and the reasons why refund was claimed. In such claim reference was made to the decision of the circuit court of appeals in the Standard Oil Case. The then tax commissioner thereupon sent the following communication to the plaintiff:

"Your formal application for refund of the additional assessments made against your company by the Tax Commissioner of the State of North Dakota, for the years 1921 and 1922, involving the amount of

$55,580.58, has been duly received. After due consideration you are hereby notified that the said application has been approved.

"Inasmuch as the 1919 Income Tax Law of the State of North Dakota does not provide any means for the refunding of income taxes erroneously paid to the state, it is necessary that a special appropriation be made by the Legislative Assembly.

"I am therefore presenting to the House Appropriations Committee of the 21st Legislative Assembly, a Bill providing for such an appropriation."

Conformable to the recommendation of the state tax commissioner the legislative assembly appropriated money for the payment of plaintiff's claim but the appropriation was vetoed by the governor. In his veto message the governor said:

"I understand that this appropriation was passed for the purpose of refunding the sum of $55,580.58 to the Ford Motor Company, being the amount of certain income taxes which it is said was in the year 1923 illegally collected by the State Tax Department and paid under protest by this company. The State Tax Commissioner has advised the Legislature that this refund is legally and justly due to the Ford Motor Company.

"This bill, however, makes no reference to the Ford Motor Company, nor to the circumstances under which the claim arises. Owing to the size and character of the claim, and the long period of time during which it has been pending, I feel that it should not be paid by the State until its validity has been established in the Courts. . . ." Laws 1929, pp. 393, 394; Ford Motor Co. v. State, 59 N. D. 792, 231 N. W. 883.

On this appeal it is contended by the appellant:

1. That plaintiff's business within the state of North Dakota was easily and certainly separable from such total business within and without the state and that, consequently, the income tax should have been computed on that portion of the total net income which the business in the state bears to the total business both within and without the state.

2. That in determining the income tax payable by the plaintiff for the years 1921 and 1922 the state was justified in computing the same upon the basis of allocating to the state that proportion of the total net income of the plaintiff earned both within and without the state which

its sales within the state bore to its total sales both within and without the state.

3. That upon failure of the plaintiff to furnish information with reference to sales made by it during the years 1921 and 1922 the state was justified in utilizing the report of sales made by the plaintiff for the year 1920 as a basis for determining its sales in 1921 and 1922 for the purpose of fixing its net income within the state for those years.

4. That the plaintiff had an available administrative remedy which it failed to pursue.

5. That plaintiff made voluntary payment of the taxes in dispute and consequently cannot recover.

These propositions will be considered in the order stated.

The first three contentions in reality resolve themselves into one, namely, that the additional assessments made by the state tax commissioner were valid. These contentions will therefore be considered together.

1. It will be noted that the controversy between the plaintiff and the state tax commissioner arose over the proper method or basis to be utilized in computing plaintiff's income tax for the years 1921 and 1922. The tax had been computed by plaintiff, and it had made payment, on the theory that the second of the two alternative bases or modes of allocation prescribed by the statute was applicable. That is, the tax had been computed on the theory that plaintiff's "business within the state" was "not otherwise more easily and certainly separable from such total business within and without the state," and that hence for the purpose of computing the income tax the "business within the state" should be held "to mean that proportion of total business within and without the state which the property" of the plaintiff within the state bore "to its entire property employed in such business within and without the state." The tax commissioner, on the other hand, contended that this basis should not have been employed and that plaintiff's business within the state should have been separated from its total business both within and without the state, and that plaintiff's taxable net income should be deemed to be that portion of the total net income which plaintiff's business within the state bore to its total business both within and without the state. In support of the contention that plain-

tiff's business within the state was "more easily and certainly separable from such total business within and without the state" the defendant calls attention to the fact that up to and including 1920 the returns made by the plaintiff to the state tax commissioner were such as to afford basis for computing the tax under the first method provided in the statute, namely, by a separation of the business within the state from the total business of the corporation, both within and without the state; hence it is said that it would have been entirely possible for the plaintiff to have furnished information and made computation of the income taxes for 1921 and 1922 on a similar basis.

One Moekle was called as a witness for the plaintiff. He testified that he was assistant auditor of the plaintiff corporation in charge of all its tax work "from 1920 to 1927." He further testified that the plaintiff corporation came into existence in 1920; that prior to that time the manufacture and sale of Ford cars and products had been carried on by the Ford Motor Company, a Michigan corporation, but that in 1920 the assets and business of that corporation were transferred to the plaintiff. He also testified that a new accounting system was set up, applicable to the business transacted subsequent to and including the year 1921. He further testified that "including 1920 and prior to that time we handled a branch like North Dakota as if it were a separate institution although it was a branch in fact and charged the cars and parts to it at arbitrary prices, and that was abandoned because it was found that as our manufacturing situation became more complicated it didn't give a true picture." On being asked whether it was abandoned on account of the enactment of the income tax law in North Dakota, he answered: "No, it was abandoned everywhere regardless whether there were income tax or not." He also testified that it would have been quite difficult to separate the business of the plaintiff corporation, during 1921 and 1922, within the state from the total business of the corporation both within and without the state so as to ascertain that portion which the business within the state bore to the total business both within and without the state. He said: "We would have had to determine the proportion of the manufacturing expenses, administrative expenses and all other expenses had outside of the State of North Dakota both in our main plants and in our branch plants that

would have been applicable to the North Dakota business and that, of course, would have been practically an impossible thing to do."

There is no claim that the additional assessment for 1921 and the assessment for 1922 made by the tax commissioner in May, 1923, were made on a basis prescribed in the income tax law at all. As indicated in the letter of the tax commissioner of May 14th, the assessment was made "upon the basis of apportioning to North Dakota that proportion of your (plaintiff's) entire net income which your (plaintiff's) North Dakota sales bear to your (plaintiff's) entire sales." In short, the state tax commissioner (as testified by the deputy tax commissioner) construed the word "business" to mean "gross sales" and assessed taxes solely on the basis of sales. It seems too clear for argument that this construction was not warranted and that the method or basis adopted by the state tax commissioner was not authorized by the income tax law.

The "business" of the plaintiff corporation was not merely to sell but to manufacture, assemble and market automobiles, trucks and other products throughout a large area. Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 120, 65 L. ed. 165, 169, 41 S. Ct. 45. Its business extended even to the production of raw material from which the finished products were manufactured. The purpose of the statute was to open to taxation that share of the net profits of the corporation attributable to its operations in North Dakota. Underwood Typewriter Co. v. Chamberlain, supra; see also Wallace v. Hines, 253 U. S. 66, 69, 64 L. ed. 782, 786, 40 S. Ct. 435. In case of a corporation like the plaintiff that carries on business in many different states, and whose profits are earned by a series of transactions beginning with the manufacture and ending with the sale of its products throughout every state in the Union, there is an obvious difficulty in allocating specifically the profits earned by the processes conducted within the borders of any one state. Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 65 L. ed. 165, 41 S. Ct. 45, supra. And to meet this difficulty the legislature adopted the methods set forth in the statute for the ascertainment of the net income attributable to the operations in North Dakota of a corporation engaged in business partly within and partly without the state. But, as said, the state tax commissioner, in making the assessments in question here, did not follow the rule or apply the standards prescribed by the statute.

The language used by the circuit court of appeals in Fisher v. Standard Oil Co. (C. C. A. 8th) 12 F. (2d) 744, is directly applicable here. The court said:

"The Tax Commissioner of North Dakota pursuant to said statute, did determine from the reports filed by the plaintiff, that plaintiff realized a net income from its sale of petroleum products during each of the years involved and the amount thereof, and then determined for each year the ratio of allocation as prescribed by the statute and applied such ratio of allocation so determined to the amount of net income the plaintiff derived from sales of petroleum products and by-products and thus arrived at the amount of plaintiff's net income which should properly be allocated to North Dakota for taxation purposes, *using as a measure of the amount of business within and without the state the respective amounts of the total gross sales of petroleum products within and without the state,* and the Tax Commissioner then proceeded to compute, assess, and certify the tax complained of upon the amount of net income thus allocated to North Dakota. . . . The ratio of allocation was wholly apart from a property basis. It was on a gross sales basis. Section 10 (c) and § 27 each expressly provide that where the income is derived from business conducted partly within and partly without the State it is taxable in that proportion which the business within the State bears to the entire business within and without the State; and where such business within the State is not otherwise more easily and certainly separable from such business without the State, business within the State shall be held to mean such proportion of the total business within and without the State as the property of such individual or corporation engaged in such business within the State bears to its entire property so engaged within and without the State. This is a clear and explicit declaration that the ratio of allocation to be applied, where the business within the State is not easily and certainly separable from business without the State, is arrived at on a property basis, that is, 'business within the state shall be held to mean such proportion of the total business within and without the state as the property of such individual or corporation engaged in such business within the state bears to its entire property so engaged within and without the state;' and the statute may be searched in vain for the ratio which was applied in the reassessment—the relation of

total gross sales within to those without and within the State, applied to appellee's net income within and without the State. For the purpose of allocation, if that became necessary, there was no occasion for speculation by the commissioner as to the meaning of business within and without the State. The statute carries its own definition for that purpose.

"We think it clear that the method thus adopted for the purpose of arriving at the net income within the State cannot be found in the statute, and that it is contrary to and in conflict with the property basis method which those sections require. . . .

"It is earnestly insisted by appellants that if a property basis of allocation is to be resorted to, only the property of appellee devoted to the sale and distribution of its products should be used; because that is the only property used in connection with transactions from which profits or net income can be derived, and that property used in the production, manufacture and refining should be excluded; and this, it is said, would result in a great increase in taxes over those levied under the first assessments. But there are two answers to the contention: no property basis was used in the reassessment; secondly, as said in Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 120, 65 L. ed. 165, 169, 41 S. Ct. 45, 47: 'The profits of the corporation were largely earned by a series of transactions beginning with the manufacture in Connecticut and ending with sale in other States.' In that case the profits allocated to Connecticut, on which the tax was based, accrued chiefly from manufacture in that State, as compared to sales made there and elsewhere.

"Section 12 has been discussed, but neither side claims for it a definite meaning, and the purpose it was intended to serve is not clear. Plainly, it requires that the taxable net income of a foreign corporation from business carried on within the State, which also conducts business without the State, shall be ascertained by simple deductions, after having at hand the requisite primary facts. If these primary facts—net income from all sources and net income from sources without the State—are not to be ascertained according to the provisions of §§ 10 and 27, and § 12 must be regarded as standing independent of the other two sections, permitting some other method of ascertaining net income within the State—then §§ 10 and 27 would seem to be in

conflict with § 12. The statute does not advise us how the basic facts for. computation under § 12 are to be obtained, whether by allocation under §§ 10 and 27 or by direct investigation of all of appellee's business, and separately its business without the State, for the purpose of ascertaining net income in those two respects. But on the facts of this case a solution of that inquiry does not seem to be necessary. The reassessments, which the bill attacked, were made on a ratio of allocation unauthorized, and not permissible under the statute. Theories of allocation can have no place in the inquiry, if net income within the State stands on its own footing unmixed with outside business. Wallace v. Hines, 253 U. S. 66, 64 L. ed. 782, 40 S. Ct. 435."

We are all 'agreed that the reassessments in question here "were made on a ratio of allocation unauthorized and not permissible under the statute," and, hence, were illegal and invalid.

2. Did the plaintiff have an administrative remedy against the collection of the illegal tax, which it failed to pursue? We think not.

In the decision on the former appeal this court considered the question whether plaintiff had failed to pursue some available administrative remedy and ruled that no such remedy was available. The principal contention advanced on the former appeal was that a statute enacted by the legislative assembly in 1923 furnished an adequate administrative remedy. For reasons set forth at length in the opinion on the former appeal we reached the conclusion that that remedy was not. applicable to the claim of the plaintiff here, and that such remedy was intended to be applicable only to assessments made after that statute became operative.

(Ford Motor Co. v. State, 59 N. D. 792, 805, 231 N. W. 883.) It is now claimed that § 22, chapter 224, Laws 1919, furnished plaintiff an administrative remedy for correction of the error in the additional assessments, and that payment by it of the tax without invoking such remedy rendered the payment a voluntary one. In our opinion this argument is without merit. The section in question provides:

"If the commissioner have reasons to believe that the amount of any income returned is understated, he shall give due notice to the person making the return to show cause why the amount of such return should not be increased, and upon proof that the amount has been understated, he may increase the same accordingly. Such person may fur-

nish sworn testimony to prove any relevant facts, and on application shall be given a formal hearing by the commissioner, and if dissatisfied with the ruling of the commissioner, may appeal to the state board of equalization."

It will be noted that this section, according to its terms, applies only when the tax commissioner has reason to believe "that the amount of any income returned is understated." In such case it authorizes and requires the tax commissioner to "give due notice to the person making the return to show cause why the amount of such return should not be increased." There was no claim by the commissioner in this case that the amount of the income returned had been understated nor was there any notice to show cause why the amount of the return should not be increased. It is true, the commissioner, in his letter of April 30th, stated: "If you have any additional figures to submit in regard to these taxes they should be submitted to us at once;" but this obviously had reference only to the "figures" set forth in the letter, and on which the tax commissioner computed the amount of the assessment. The tax commissioner's letter, when construed in light of the undisputed facts and circumstances, leaves no doubt that no further hearing would be afforded on the point in dispute between the parties, namely, as to the method or ratio to be adopted in computing plaintiff's income tax. On that point the commissioner had made his decision in accord with the method or ratio (which according to the undisputed testimony) he applied in all similar cases. And in the tax commissioner's letter of May 14th he announced that the assessment had been made and that the same would be certified to the state treasurer for collection. Section 22 did not contemplate that the State Board of Equalization should function as a court of review for the purpose of determining disputed questions of law. According to its terms it was intended to apply to only one situation, namely, where the tax commissioner claimed that "the amount of any income returned is understated." That was not the contention or claim in this case. The commissioner required no additional return. He purported to make his reassessments upon the returns that had been made, by a method which the law did not permit.

Section 22 does not purport to empower the State Board of Equalization to review and set aside an assessment made by the tax commis-

sioner. The hearing authorized thereby is limited to the question whether the amount of an income returned is understated and to that alone, and, hence, the review by the Board of Equalization would necessarily be limited to that same question. The statute nowhere purports to authorize the Board of Equalization to review an assessment that has been made by the state tax commissioner and no provision is made to stay the enforcement of such assessments, or to suspend the penalties, which the statute inflicts upon those who fail to make payment, pending a review of an assessment made by the tax commissioner.

■ It is next contended that in any event the plaintiff made voluntary payment of the tax and consequently cannot recover.

The trial court found that the state treasurer made demand upon the plaintiff in writing for the payment of the additional income tax assessments in question here and upon the record presented on this appeal we cannot say that this finding is contrary to the evidence. Under the statute failure to pay such additional assessment within ten days after demand by the state treasurer subjects the taxpayer to a penalty of five per cent on the amount of the tax unpaid and interest at the rate of one per cent per month. The income tax law also provides that:

"In any case where a tax assessed under the provisions of this Act is due and unpaid, the business or property within the state from which the income tax is derived, shall be liable for the payment of said tax, together with the penalties, by forfeiture of the franchise or privilege of such business or the distraint of such property; and the commissioner is hereby authorized to institute such proceedings in the proper courts of the state as may be necessary for the enforcement of the provisions of this section." Laws 1919, chapter 244, § 13 (subdiv. e), as amended by chapter 60, Special Session, 1919."

In this case a situation existed where plaintiff's rights were so threatened that it might successfully have resorted to a court of equity for injunctive relief. Fisher v. Standard Oil Co. (C. C. A. 8th) 12 F. (2d) 744, supra. But if it had applied for injunctive relief the penalty and interest charges fixed by the statute would have continued to accrue during the time that would elapse before the validity of its defense to the tax might be adjudged. Atchison, T. & S. F. R. Co. v. O'Connor, 223 U. S. 280, 56 L. ed. 436, 32 S. Ct. 216, Ann. Cas. 1913C, 1050.

Must plaintiff wait until penalties had accrued and the summary and drastic remedy for collection provided by the statute put in force; or might it act in light of the then existing circumstances?

Unless the additional assessments were paid it would have been the duty of those charged with the collection of the tax to have enforced collection in the manner provided by statute in the immediate future. As found by the trial court the payment of the tax had been demanded, and the plaintiff had a right to assume that the public officer charged with the duty of making collection would perform such duty and enforce the collection of the taxes with penalties, interest and cost. St. Anthony & D. Elevator Co. v. Bottineau County, 9 N. D. 347, 353, 83 N. W. 212, 50 L.R.A. 262. The record in this case establishes beyond all doubt that the plaintiff at all times contended that the additional assessments were illegal and without warrant or authority of law; and that it paid them only to avoid the onerous penalties which the income tax law imposes for the nonpayment of a tax assessed under its provisions. At the very time of payment the plaintiff in no uncertain terms so informed the collector and further stated its intention to institute appropriate proceedings for a recovery of the amounts paid. There can be no doubt that the plaintiff would not have made payment except for the compulsion of the penalties prescribed by the law to be visited on those who neglected or refused to pay. We are of the opinion that plaintiff was not called upon to take the risk to which it would have been subjected by failing to make payment. In short, we are of the opinion that payment was made under compulsion, and that the trial court was correct in holding that the additional assessments for the years 1921 and 1922 were paid "involuntarily, and under legal compulsion and with protest, for the purpose of avoiding heavy penalties and forfeitures provided by law in the event said payments were not paid as assessed and demanded." Atchison, T. & S. F. R. Co. v. O'Connor, 223 U. S. 280, 56 L. ed. 436, 32 S. Ct. 216, Ann. Cas. 1913C, 1050; Chicago, M. & P. S. R. Co. v. Bowman County, 31 N. D. 150, 153 N. W. 986; Malin v. LaMoure County, 27 N. D. 140, 145 N. W. 582, 50 L.R.A.(N.S.) 997, Ann. Cas. 1916C, 207; Underwood Typewriter Co. v. Chamberlain, 92 Conn. 199, 108 A. 154; Adrico Realty Corp. v. New York, 250 N. Y. 29, 164 N. E. 732, 64 A.L.R. 1; 3 Cooley, Taxn. 4th ed. § 1283.

Atchison, T. & S. F. R. Co. v. O'Connor, 223 U. S. 280, 56 L. ed. 436, 32 S. Ct. 216, Ann. Cas. 1913C, 1050, supra, was an action to recover corporate stock taxes assessed under the laws of Colorado and paid by the railroad company under protest. There, as here, it was contended that payment was voluntary. In disposing of that contention the Supreme Court of the United States, in an opinion written by Mr. Justice Holmes, said:

"It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. The rule being established that, apart from special circumstances, he cannot interfere by injunction with the state's collection of its revenues, an action at law to recover back what he has paid is the alternative left. Of course, we are speaking of those cases where the state is not put to an action if the citizen refuses to pay. In these latter he can interpose his objections by way of defense; but when, as is common, the state has a more summary remedy, such as distress, and the party indicates by protest that he is yielding to what he cannot prevent, courts sometimes, perhaps, have been a little too slow to recognize the implied duress under which payment is made. But even if the state is driven to an action, if, at the same time, the citizen is put at a serious disadvantage in the assertion of his legal, in this case of his constitutional, rights, by defense in the suit, justice may require that he should be at liberty to avoid those disadvantages by paying promptly and bringing suit on his side. He is entitled to assert his supposed right on reasonably equal terms. See Ex parte Young, 209 U. S. 123, 146, 52 L. ed. 714, 723, 28 S. Ct. 441, 13 L.R.A.(N.S.) 932, 14 Ann. Cas. 764. If he should seek an injunction on the principle of that case and of Western U. Teleg. Co. v. Andrews, 216 U. S. 165, 54 L. ed. 430, 30 S. Ct. 286, he would run the same risk as if he waited to be sued.

"In this case the law, besides giving an action of debt to the state, provides that every corporation that fails to pay the tax shall forfeit its right to do business within the state until the tax is paid, and also shall pay a penalty of 10 per cent for every six months or fractional part of six months of default after May 1 of each year. It may be that the forfeiture of the right to do business would not be authoritatively established except by a quo warranto provided for in a following section but before or without the proceeding, the effect of the forfeiture clause

upon the plaintiff's subsequent contracts and business might be serious (see Ludwig v. Western U. Teleg. Co. 216 U. S. 146, 54 L. ed. 423, 30 S. Ct. 280), and in any event the penalty would go on accruing during all the time that might be spent before the validity of the defense could be adjudged. As appears from the decision below, the plaintiff could have had no certainty of ultimate success, and we are of the opinion that it was not called upon to take the risk of having its contracts disputed and its business injured, and of finding the tax more or less nearly doubled in case it finally had to pay. In other words, we are of the opinion that the payment was made under duress."

In Chicago, M. & P. S. R. Co. v. Bowman County, 31 N. D. 150, 153 N. W. 986, supra, this court considered the question of the right to recover illegal taxes paid under protest. In that case it was asserted that the taxpayer had made voluntary payment because its property had not been seized and no steps had been taken under the statute providing for the distraint and sale of property of a delinquent taxpayer. In the decision in that case this court said:

"It is also now well established, we believe, that a payment to avoid a penalty which will be incurred upon the nonpayment of taxes, which cannot be paid or at any rate will not be received without the payment of an illegal part, is a payment under compulsion. . . .

"Nor do we believe that plaintiff was compelled to wait until the danger of seizure was immediate, or to tender and deposit the amount actually due. The North Dakota statute (chapter 300 of the Laws of 1911, amending § 1554, R. C. 1905, being § 2166, Compiled Laws of 1913) requires the county treasurer to deliver a list of the delinquent taxes to the sheriff on the 1st day of October. It requires the sheriff to immediately proceed to collect such taxes, and to distrain and sell the property upon which the taxes are delinquent at public vendue. Neither the sheriff nor the treasurer have the authority to cancel or rebate illegal taxes. The duty of the sheriff is peremptory and immediate. It is certainly a wise policy to encourage the payment under protest of disputed taxes rather than withholding from the county the amount or waiting for the seizure to be actually made or threatened. 'The proper administration of the fiscal affairs of the government,' says the Circuit Court of Appeals in Herold v. Kahn (C. C. A. 3d) 163 F. 947, 're-quires that the payment of taxes should not be delayed by disputes as

to their legality but that the taxes should first be paid and all questions in regard to them be determined in suits brought for their refunding.' It is a wise policy, therefore, that encourages the payment under protest."

In view of the conclusion we have reached as regards the right of the plaintiff to a refund of the assessments paid by it, the question arises as regards the right of plaintiff to recover, and the duty of the defendant state to pay, interest. The trial court awarded interest. In our opinion this is erroneous. It is well settled, "both on principle and authority, that a state cannot be held to the payment of interest on its debts unless bound by act of the legislature or by a lawful contract of its executive officers made within the scope of their duly constituted authority." 15 R. C. L. p. 17. United States v. North Carolina, 136 U. S. 211, 34 L. ed. 336, 10 S. Ct. 920; note in Ann. Cas. 1914A, 361; United States v. Sherman, 98 U. S. 565, 25 L. ed. 235; United States v. Verdier, 164 U. S. 213, 41 L. ed. 407, 17 S. Ct. 42; Schlesinger v. State, 195 Wis. 366, 218 N. W. 440, 57 A.L.R. 352.

This principle is applicable to claims for the refund of taxes and actions for the recovery of taxes erroneously paid, or illegally imposed and collected. Schlesinger v. State, supra; Queen City Oil Co. v. Toole County, 86 Mont. 401, 283 P. 771; Jackson County v. Kaul, 77 Kan. 715, 96 P. 45, 17 L.R.A.(N.S.) 552; Birch v. Orange County, 191 Cal. 235, 215 P. 903.

We are aware of no statutory provision in this state that either directly or by necessary implication provides for the payment of interest by the state upon the claims involved in this case.

It follows from what has been said that the judgment appealed from must be modified so as to eliminate allowance of interest, and that as so modified it must be affirmed. It is so ordered.

BURKE, Ch. J., and MOELLRING, NUESSLE and BURR, JJ., concur.