**LADISH MALTING COMPANY, a foreign corporation, Plaintiff, Appellee, and Cross-Appellant,**

v.

**STUTSMAN COUNTY, acting By and Through the STUTSMAN COUNTY BOARD OF COMMISSIONERS, and the State of North Dakota, acting By and Through the State Board of Equalization, Defendants, Appellants, and Cross-Appellees.**

Civ. No. 11400.

Supreme Court of North Dakota.

Nov. 19, 1987.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiff, appellee, and cross-appellant; argued by Douglas R. Herman.

Wendy P. Schulz, States Atty., Jamestown, for defendant, appellant, and cross-appellee Stutsman County, acting by and through the Stutsman County Board of Commissioners. Present but did not argue.

Robert W. Wirtz, Asst. Atty. Gen., Bismarck, for defendant, appellant, and cross-appellee State of N.D., acting by and through the State Board of Equalization.

GIERKE, Justice.

Ladish Malting Company, Stutsman County, and the State of North Dakota appeal from a district court judgment modifying a decision by the Stutsman County Board of Commissioners [Board] classifying real and personal property at the Lad-

ish malting plant for the 1981 tax year. We remand to the Board for modification.

The relevant facts underlying this appeal are set forth in a prior appeal involving the same tax year, *Ladish Malting Co. v. Stutsman County*, 351 N.W.2d 712 (N.D. 1984) [*Ladish I*], and will not be repeated here. In *Ladish I* we interpreted N.D.C.C. § 57-02-04, and concluded that personal property exempt from taxation[1] included items:

"(1) [W]hich pertain to the use of structures and buildings (such as machinery or equipment used for trade or manufacture), *and* (2) which are not constructed as an integral part of and are not essential for the support of such structures or buildings, *and* (3) which are removable without materially limiting or restricting the use of such structures or buildings. Thus, an item which pertains to the use of structures and buildings should be

classified as personal property only if it is not constructed as an integral part of and is not essential for the support of structures or buildings and is removable without materially limiting or restricting the use of structures or buildings." [Emphasis in original.] *Ladish I, supra,* 351 N.W.2d at 721.

Because the record was inadequate to review the classification of the property in the Ladish plant as either real or personal property, we remanded to the Board for a new hearing in light of our construction of the statute. On remand the Board determined that the Ladish plant consisted of real property valued at $46,651,440. Both the State and Ladish appealed to the district court which modified the Board's determination and concluded that the malting plant consisted of real property valued at $29,689,502.[2]

---

1. Locally assessed personal property is generally exempt from taxation. N.D.C.C. § 57-02-08(25). Personal property includes all property that is not included within the definition of real property. N.D.C.C. § 57-02-05.1. N.D.C.C. § 57-02-04, provides:

"Real property, for the purpose of taxation, includes:

"1. The land itself, ... and improvements to the land, ... and all rights and privileges thereto belonging or in anywise appertaining, and all mines, minerals, and quarries in and under the same....

"2. *All structures and buildings*, including systems for the heating, air conditioning, ventilating, sanitation, lighting, and plumbing of such structures and buildings, and all rights and privileges thereto belonging or in anywise appertaining, *but shall not include items*

which pertain to the use of such structures and buildings, such as machinery or equipment used for trade or manufacture which are not constructed as an integral part of and are not essential for the support of such structures or buildings, and which are removable without materially limiting or restricting the use of such structures or buildings.

"3. Machinery and equipment, but not including small tools and office equipment, used or intended for use in any process of refining products from oil or gas extracted from the earth, but not including such equipment or appurtenances located on leased oil and gas production sites." [Emphasis added.]

2. The Board and the district court classified the property as follows [values are from Patchin's 1981 appraisal]:

| | BOARD | | DISTRICT COURT | |
| --- | --- | --- | --- | --- |
| | REAL PROPERTY | PERSONAL PROPERTY | REAL PROPERTY | PERSONAL PROPERTY |
| Compartments A–E | | | | |
| Structure and Supporting Components | 8,404,931 | | 8,404,931 | |
| Conveyors, Dust Collection | 2,474,318 | | | 2,474,318 |
| Piping | | 1,469,941 | | 1,469,941 |
| Attemporators, Refrigeration, Cooling Towers, Fans | | 3,328,638 | | 3,328,638 |
| Steep Tanks (45) | | 900,458 | | 900,458 |
| Tray Floors | | 519,774 | | 519,774 |
| Machinery (Misc.) | | 1,310,275 | | 1,310,275 |
| Electrical | 930,127 | | | 930,127 |
| KILNS 1–5 | | | | |
| Structure, Supporting Components, Hoppers | 7,880,954 | | 2,265,145 | 5,615,809 |
| Electrical | 2,130,459 | | | 2,130,459 |
| Fans | | 404,525 | | 404,525 |

The State contends that the Board erred in classifying certain property at the malting plant as personal property. The State argues that, except for the Related Facilities (pollution control devices) having a value of $4,370,440, (see fn. 2) the entire malting facility was real property with an assessed value of $57 million. Ladish argues that the Board erred in classifying certain property at the malting plant as taxable real property and asserts that the malting plant consisted of real property with an assessed value of $14,483,052.[3]

None of the parties dispute the values assigned to the items of property. Rather, they dispute the characterization of the items of property as either real or personal property. We must initially determine our standard of review for this appeal from a district court decision which modified a decision by the Board involving the classification of certain items of property as either real or personal property.

■ While we do not substitute our judgment for that of the Board, we determine whether or not the Board's action comports with a correct interpretation of the law and whether or not the Board has acted in an arbitrary, capricious, or unrea-sonable manner. *Conway v. Board of County Commissioners*, 349 N.W.2d 398 (N.D.1984); *Shaw v. Burleigh County*, 286 N.W.2d 792 (N.D.1979). In *Slope County v. Consolidation Coal Co.*, 277 N.W.2d 124, 127 (N.D.1979), we quoted with approval from *Henzel v. Cameron*, 228 Or. 452, 365 P.2d 498 (1961):

" 'Whether a finding is a "finding of fact" or a "conclusion of law" depends upon whether it is reached by natural reasoning or by fixed rules of law. Where the ultimate conclusion can be arrived at only by applying rules of law the result is a "conclusion of law." ... A "finding of fact" is a conclusion drawn by way of reasonable inference from the evidence.' " [Citation omitted.]

■ This case involves the classification of property as either real or personal and does not involve the valuation of that property. Compare *Appeal of Johnson*, 173 N.W.2d 475 (N.D.1970). The applicable law, N.D.C.C. Ch. 57–02, is set forth for the Board and the classification of property as either real or personal requires the correct interpretation and application of that law to the items of property. The application of that law is not a policy-making function

| | BOARD | | DISTRICT COURT | |
| --- | --- | --- | --- | --- |
| | REAL PROPERTY | PERSONAL PROPERTY | REAL PROPERTY | PERSONAL PROPERTY |
| Conveyers | 1,854,919 | | | 1,854,919 |
| Tray Floors | | 1,180,380 | | 1,180,380 |
| Machinery (Misc. Equipment) | | 1,140,758 | | 1,140,758 |
| MALT ELEVATORS | | | | |
| Structure | 8,854,833 | | 8,854,833 | |
| Equipment | 3,958,306 | | | 3,958,306 |
| BARLEY ELEVATORS | | | | |
| Structure | 8,183,400 | | 8,183,400 | |
| Misc. Machinery & Equip. (1979) | 1,979,193 | | 1,979,193 | |
| RELATED FACILITIES | | 4,370,440 | | 4,370,440 |
| Sub-totals | 46,651,440 | 14,625,189 | 29,689,502 | 31,589,127 |
| GRAND TOTALS | 61,276,629 | | 61,276,269 | |

3. Ladish asserts the following property is real property:

| | |
| --- | --- |
| Barley Elevators (# 1 and # 2) | $8,183,400 |
| Malthouse (structural walls, floors and roof only) | 2,824,992 |
| Kilns (structural walls, floors and roof only) | 2,265,145 |
| Train Shed | 190,343 |
| 6" Concrete Slab | 160,848 |
| R.R. Spur | 73,380 |
| Cleaner Building | $ 351,265 |
| Clean Water Pump House | 9,501 |
| Waste Water Pump House | 54,914 |
| Water Reservoir | 87,332 |
| Storage Tanks (Finished Malt) | 209,932 |
| "Texas" Over Malt Elevators | 72,000 |
| TOTAL: | $14,483,052 |

like in *Shaw v. Burleigh County, supra,* but is instead a quasi-judicial function. The classification depends, in part, on prior judicial decisions and the legislative history of the statute which can be arrived at only by applying rules of law. That decision thus involves a question of law which is subject to full review by a court. Consequently, we will review the Board's decision to determine whether its classifications comport with a correct interpretation of the law.

On remand there was evidence presented to establish that many of the items in the Ladish plant could be periodically replaced. However, we specifically did not adopt that expansive a test in *Ladish I* and construed the movability aspect to encompass both economic as well as physical considerations. Jack Kiffe, an engineering expert, testified about the cost of removing certain items of property from the malthouse and malt elevator.[4] In effect he submitted a bid of about $1.4 million to remove those items. Peter Patchin testified that the salvage value of the items in Kiffe's bid was approximately $9.5 million, and after removal, the remaining value of the structure was approximately $7.6 million. Patchin

testified that after removal of the disputed items, the remaining structures would be usable; however, he further testified that removing the disputed items would diminish the value of the plant by $24 million which, according to him, would be economically catastrophic and would render the remaining structure non-functional. Patchin thus concluded that that property should be taxable real property.

The State contends that Ladish has not met its burden to establish the exempt status of the items in dispute and that Patchin's testimony supports its position that the Ladish plant consists of real property having an assessed value of $57 million. The State argues that, in classifying the entire plant as real property, it is not contrary to *Ladish I* to refer to the plant as a special-purpose facility and to consider plant location in determining possible alternative uses of the facility. Ladish responds that Kiffe's testimony supports its position that all items in the plant were physically removable and that Patchin's testimony supports its position that those items in dispute were economically removable. Ladish argues that the State has improperly interjected special use and location into the con-

---

4. The Kiffe bid included items in the malt elevator and malt house but did not include items in the barley elevator. (See fn. 2.) The malt elevator items were as follows with the cost of removal in parenthesis: Kiln transfer leg 'A' and spouting (10,005); Scale hoppers (2) and spouting (39,160); Malt cleaners (2) and spouting (4,165); Cleaner cross screw conveyors (2) and spouting (5,560); Blending tank fill screw conveyor (4) and spouting (8,330); Blending tanks (6) (98,170); Blending tanks reclaim conveyor (4) and spouting (5,550); Blending tanks pick-up conveyor (1) and spouting (2,080); Main leg 'B' and spouting (10,145); Load-out leg 'C' and spouting (8,030); Load-out aspirator conveyor and spouting (2,180); Load-out aspirator and spouting (2,180); Load-out bins fill conveyor and spouting (3,470); Quadrated load-out bins (2) and spouting (35,220); Final malt cleaners (2) (4,165); Rail car loading conveyor (2) and spouting (5,550); Dust collection systems (7) in head house (59,665); Manlift (5,551);

The malt house items were as follows with the cost of removal in parenthesis: Conveyor from barley elevator (5,550); Cross steep conveyor and spouting (2,775); Steep tanks fill conveyor and spouting (20,820); Air collection piping above steel tanks (20,120); Acitation air piping

(6,940); Water lines to steep tanks (13,880); Water lines to roof units (5,550); Miscellaneous overhead piping (3,470); Steep tanks—remove intact and replace roof etc. (325,990); Steep tanks lower piping water, slurry and misc. (48,040); Chiller room, chillers, piping, pumps, air compressors and miscellaneous (104,870); Misc. germination compartment piping (27,185); Germination slurry piping (27,185); Germination turning machines (20,625); Germination compartment end gates (4,855); Germination air control vanes (9,060); Outside air control vanes (2,265); Attemperator pumps and piping (13,590); Attemperator spray nozzles (9,060); Germination fans (39,495); Germination compartment cleaning machines (3,115); Germination floor trays (36,575); Germination water piping (2,260); Germination compartments discharge conveyors (86,740); Green malt gathering conveyors and spouting (11,520); Green malt inclined conveyors to legs (7,050); Green malt legs (2) (6,805); Main kiln distribution conveyors and spouting (18,145); Kiln filling conveyors and spouting (42,095); Kiln fans (22,985); Kiln turning machines (23,635); Kiln floor panels (73,470); Power units for panels (2,265); Kiln by-pass air ducts (16,190); Electric kiln heaters (33,030); Kiln discharge conveyors and spouting (64,800);

sideration of alternative uses of the remaining structure.

In *Ladish I, supra,* 351 N.W.2d at 719–720, we quoted the following from the Report of the Legislative Council:

" 'Following extensive review and discussion of classification problems, the committee recommends a bill which would redefine real property to include, basically, only the land itself and buildings.... The definition of buildings ... would not include items which pertain to the use of such buildings, such as machinery or equipment used for trade or manufacture, which are not constructed as an integral part of and are not essential for the support of the buildings, and which are removable without materially limiting or restricting the use of such buildings.

" '*The committee recognizes that the bill which it recommends would remove most items of property from the tax rolls which fall into that questionable area between real and personal property, such as industrial machinery and equipment. However, the view was expressed that this had been the intention of the last legislature in repealing personal property taxes, and that anything short of removing all items of property which come under the two clear classifications would result in continuing inequities in taxation. The committee is also aware that some political subdivisions rely heavily upon certain large industries the machinery and equipment of which supply a large portion of the tax base. The solution to these problems, it was concluded, lies in alternative methods of taxing certain industries, such as sugar beet plants and oil refineries, rather than continuing to assess such property as real estate.*' Report of the Legislative Council 1971, at 55." [Emphasis in original.]

That legislative intent formed the basis for our rejection of the State's argument about special-use in *Ladish I:*

"To construe the word 'use' as that particular use to which a taxpayer has employed its structures or buildings would not accommodate the legislative intent to exempt those items of property which fall into the questionable area between real and personal property, i.e., items such as industrial machinery and equipment. If items are used directly in and solely for effectuating that particular purpose to which the taxpayer has employed its structures and buildings, the removal of the items would naturally, in most instances, restrict or limit that particular use. Illustrative is testimony elicited at trial wherein the view was expressed that removal of disputed items from the Ladish plant would certainly prohibit the malting of barley. We construe the statute in a less restrictive manner. Items which are removable without materially limiting or restricting that quality of a structure or building that makes it useful or suitable for any purpose constitutes a construction more conducive to the legislative intent expressed. In other words, items which can be removed without rendering the structure or building nonfunctional, without extensive repair or redesign of the structure or building, and without replacement of removed items satisfy the requirement that personal property be 'removable without materially limiting or restricting the use of such structures or buildings.'

"The word 'removable' requires that the movability of property also be considered in determining whether an item is real or personal property for tax purposes. We realize that from a theoretical standpoint any structure or building ever built might conceivably be moved. As William Meyer succinctly stated at trial: 'If you build it you can unbuild it.' Without adopting that expansive a test, we construe this movability aspect of Section 57–02–04(2) to encompass both economic as well as physical considerations.... Where physical or economic considerations so negate movement as a matter of practicability, the property should be found to be real property. Here a reasonableness test

must be applied." [Citation omitted.] *Ladish I, supra,* 351 N.W.2d at 722.

The statement of legislative intent not only reflects a less restrictive test regarding alternative uses for the remaining structure or building but also tempers the economic and physical considerations involved in classifying property. While location is a function of market value which in turn is related to economic considerations, we do not believe that location, by itself, requires a particular classification of property. An interpretation classifying property as either real or personal based on location would be inconsistent with uniformity of taxation. We believe the State's argument on special-purpose and location overlooks that statement of legislative intent. With that in mind, we thus turn to an analysis of the classifications of the items of property.

The Board should have disclosed the reasons for its decision. *Shaw v. Burleigh County, supra,* 286 N.W.2d at 800. Nevertheless, we believe the record contains sufficient evidence for our review. Additionally, the analysis of the district court is before us and is entitled to respect because the legislatively mandated review by the district court cannot be ineffectual. *Medcenter One, Inc. v. Job Service,* 410 N.W.2d 521 (N.D.1987).

Ladish specifically contends that the district court erred in classifying as real property the miscellaneous machinery and equipment worth $1,979,153 located in the barley elevators. (See fn. 2.) In its memorandum opinion, the district court stated:

"In my original decision during the first appeal, I found the miscellaneous machinery and equipment to be personal property but I have since examined the record more thoroughly and I cannot find any evidence sufficient to justify my previous analysis. No evidence exists regarding the economic feasibility of removal of these items. There is insufficient evidence to make a classification that these are personal property. The

burden is clearly upon the taxpayer to show that these particular items are tax exempt and there is nothing in the record to support that exemption."

■ Ladish asserts that when this court rejected "special-use" as a basis for classification, Ladish deemed it unnecessary to separately address those items because the record clearly established that the only basis for taxation of those miscellaneous items was under the special-use argument. During oral argument, counsel for the State essentially conceded that those items were personal property under the guidelines issued by the Office of the State Tax Commissioner in 1971 for the classification of property for tax purposes and that property's classification as real property was based on special use. We agree that those items are personal property, and we conclude that the district court erred as to that property.

■ We further conclude that the district court's analysis of the remaining items of property correctly applied the three-part test set out in *Ladish I* and the Board's classifications were erroneous to the extent that they differed from the district court's conclusions. Neither party, as an appellant, has carried its burden to convince us otherwise. Accordingly, we remand to the Board to affix the appropriate values to the items of real property based on the undisputed values used throughout this proceeding. We further conclude that Ladish is entitled to an appropriate refund.

Ladish next asserts that it is entitled to interest on its refund. In January 1982, Ladish sought a temporary injunction enjoining Stutsman County from refusing to place the portion of the 1981 tax payments that were paid under protest[5] into an interest-bearing account with a local financial institution pending resolution and final determination of the 1981 tax assessment. Thereafter, the district court ordered that that part of the taxes be placed in an interest-bearing account.

**5.** According to the affidavit of Robert T. Stollenwerk, secretary-treasurer of Ladish, the amount of tax paid under protest was $222,594.78.

The State argues that Ladish is not entitled to interest because no statutory provision authorizes interest. It contends that the State is not obligated to pay interest on its debts, including the refund of taxes erroneously or illegally imposed, unless bound by act of the Legislature or by lawful contract of its executive officers, citing *Ford Motor Co. v. State*, 65 N.D. 316, 258 N.W. 596 (1935).

In *Ford Motor Co. v. State, supra*, 258 N.W. at 606, we said:

"It is well settled, 'both on principle and authority, that a state cannot be held to the payment of interest on its debts unless bound by act of the legislature or by a lawful contract of its executive officers made within the scope of their duly constituted authority.' . . .

"This principle is applicable to claims for the refund of taxes and actions for the recovery of taxes erroneously paid, or illegally imposed and collected."

This language is also applicable to counties. *Richland County v. State*, 180 N.W.2d 649 (N.D.1970).

Ladish contends that it should be allowed interest based upon the "interest of fairness and equity," citing cases from Minnesota. *See General Mills, Inc. v. State*, 303 Minn. 66, 226 N.W.2d 296 (1975).

■ There is a decided split in authority as to whether, in the absence of a specific statutory provision, a taxpayer is entitled to interest on taxes illegally assessed or charged. *General Mills, Inc. v. State; supra; see generally*, Annot., 88 A.L.R.2d 823; 72 Am.Jur.2d, State and Local Taxation, § 1068. We recognize there are equities involved in Ladish's argument. We believe that the rule in *Ford Motor Co. v. State, supra*, is based upon equities and we decline to overrule it. Nevertheless, we believe it is a logical corollary of that equitable rule to hold that interest is payable for a refund when funds paid under protest to a governmental body are set aside in an interest bearing account, thus making specific funds available for payment of interest without resort to taxpayer funds. This would encourage payments under protest while protecting other tax funds when

there is an honest dispute. Refusals to pay would otherwise be encouraged. Accordingly, under the facts of this case, we hold that Ladish is entitled to the interest earned on their refund while it was invested pursuant to court order.

We remand to the Board for proceedings consistent with this opinion.

ERICKSTAD, C.J., GIERKE and MESCHKE, JJ., and PEDERSON, Surrogate Justice, concur.

PEDERSON, Surrogate Justice, sitting in place of LEVINE, J., disqualified.

VANDE WALLE, Justice, concurring in result and dissenting.

I concur in the result reached by the majority opinion except insofar as it concludes that Ladish is entitled to the interest earned on its refund while it was invested pursuant to court order.

The majority concludes that the rule it quotes from *Ford Motor Co. v. State*, 65 N.D. 316, 258 N.W. 596 (1935), is based on equities. A reading of that decision, and those on which it relies, does not reveal that basis. Rather, it is a rule that the legislative, not the judicial, branch controls such matters. The majority opinion confuses the concept of equity with the separation-of-powers doctrine. If such a rationale prevails it may be that in the name of "equity" the separation-of-powers doctrine will be subsumed by the judicial branch.

The opinion, although it is concerned with a county, apparently will apply to the State as well. It will cause confusion in the future. As an example: Are all payments under protest now to be deposited in interest-bearing accounts, or only those ordered by a court to be so deposited? Must payments under protest from each taxpayer be deposited in a separate account, or may payments from more than one taxpayer be commingled in an interest-bearing account? Because most funds collected by the tax authorities, State or county, are now deposited in interest-bearing accounts, although not segregated from other ac-

counts, is this sufficient to require the payment of interest on refunds of taxes paid under protest? If the tax paid under protest could have been deposited in an interest-bearing account but was not, will the county or the State nevertheless be required to pay interest if there is a refund? If the county or the State does deposit the taxes paid under protest in an interest-bearing account, must it be at the best rate of interest available? Is Section 57–20–21, N.D.C.C.,[1] impliedly repealed by the majority opinion? These and very probably other questions which we have not contemplated remain to be answered. They should be answered by legislation enacted by the legislative branch of government, not by judicial legislation.

Finally, I note that when the Legislature intends there be interest paid on refunds of taxes it knows how to so specify. As an example, Section 57–39.2–25, N.D.C.C., provides that whenever a refund of sales taxes is authorized, interest "of seven percent per annum shall be allowed and paid upon any overpayment of tax from sixty days after the due date of the return or after the date such return was filed or after the date the tax due was fully paid, whichever comes later, to the date of the refund." The lack of a similar provision in Section 57–20–21 creates a strong presumption that the Legislature did not intend interest on refunds made under that section. See, e.g., *City of Dickinson v. Thress*, 69 N.D. 748, 290 N.W. 653, 657 (1940) ["It must be presumed that the Legislature intended all that it said, and that it said all that it intended to say."]

I do not believe *Ford Motor Co., supra*, and *Richland County v. State*, 180 N.W.2d 649 (N.D.1970), can be reconciled with the conclusion of the majority. I believe that the matter of the payment of taxes under protest, their deposit, and the payment of interest when there is a refund of such taxes is best determined by legislation which disposes of the issues such as I have raised above.

---

1. Section 57–20–21, N.D.C.C., provides:

   "Whenever taxes have been paid under protest, the county treasurer shall keep money thus paid and collected in a separate fund known as 'taxes paid under protest fund' and such moneys shall not be paid or disbursed to the state, to any fund of the county, nor to any local taxing district, until the period prescribed in section 57–20–20 has expired, and in case an action is commenced, the county treasurer shall retain in such fund, until such action shall be finally determined, that part or portion of the tax paid under protest which the plaintiff in his complaint contends is invalid or illegal."