LADISH MALTING COMPANY, a foreign corporation, Plaintiff, Appellee and Cross-Appellant,

v.

STUTSMAN COUNTY, acting By and Through the STUTSMAN COUNTY BOARD OF COMMISSIONERS, and the State of North Dakota, acting by and through the State Board of Equalization, Defendants, Appellants and Cross-Appellees.

Civ. No. 10533.

Supreme Court of North Dakota.

May 23, 1984.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiff, appellee and cross-appellant; argued by Douglas R. Herman, Fargo.

Charles J. Gilje, States Atty., Jamestown, and Robert W. Wirtz, Asst. Atty. Gen., Bismarck, for defendants, appellants and cross-appellees; argued by Robert W. Wirtz.

ERICKSTAD, Chief Justice.

Stutsman County and the State of North Dakota [State] appeal from a judgment which reduced the assessed value of a malting plant owned and operated by the Ladish Malting Company [Ladish] from $57 million to $28,313,968. The District Court of Stutsman County entered this judgment on July 15, 1983, entitling Ladish to an abatement of taxes. The State contends the district court erred when it classified certain property used by Ladish in the manufacture of malt as personal property exempt from ad valorem taxation pursuant to Sections 57–02–04(2), 57–02–05.1, and 57–02–08(25), N.D.C.C. Ladish also appeals from the judgment and contends the district court erred when it classified certain property as taxable real property.

Locally assessed personal property is generally exempt from assessment and taxation. § 57–02–08(25), N.D.C.C.[1] "Person-

---

1. Section 57–02–08(25), N.D.C.C., reads as follows:

"All personal property not required by section 4 of article X of the Constitution of North Dakota to be assessed by the state board of

al property ... include[s] all property that is not included within the definition of real property." § 57–02–05.1, N.D.C.C. Section 57–02–04, N.D.C.C., defines "real property," for the purpose of taxation, to include:

"1. The land itself, ... and improvements to the land, ... and all rights and privileges thereto belonging or in anywise appertaining, and all mines, minerals, and quarries in and under the same. . . .

"2. *All structures and buildings,* including systems for the heating, air conditioning, ventilating, sanitation, lighting, and plumbing of such structures and buildings, and all rights and privileges thereto belonging or in anywise appertaining, *but shall not include items which pertain to the use of such structures and buildings, such as machinery or equipment used for trade or manufacture which are not constructed as an integral part of and are not essential for the support of such structures or buildings, and which are removable without materially limiting or restricting the use of such structures or buildings.*

"3. Machinery and equipment, but not including small tools and office equipment, used or intended for use in any process of refining products from oil or gas extracted from the earth, but not including such equipment or appurtenances located on leased oil and gas production sites." [Emphasis added.]

A brief description of the Ladish plant and the malting process itself, as gleaned from the testimony and exhibits received at trial, will illustrate the magnitude of operations performed and characteristic features of the property owned by Ladish.

The malting process consists of a controlled, limited germination process, designed primarily to produce or activate enzyme systems in the barley kernel. Barley is permitted to sprout, inducing a chemical change within the kernel which converts starches into a malt sugar called maltose. Ladish utilizes a compartment malting system which features separate facilities for each of the five stages of the malting process: (1) initial storage, cleaning and grading (barley elevators), (2) steeping (steep buildings), (3) germinating (malthouses/attemporator buildings), (4) kilning (kiln buildings), and (5) aging and blending (malt elevators). The plant contains intricate systems for conveyance, dust collection, and process plumbing, heating, and refrigeration.

Barley is received by truck or rail shipment, is sampled and tested for variety, moisture content, protein level, etc., weighed and thereafter conveyed to # 1 barley elevator (cap. 1,500,000 bu.) for storage. Barley, when needed, is conveyed to # 2 barley elevator (cap. 2,200,000 bu.) for cleaning and grading. Foreign material is removed and the remaining barley is separated according to size. Barley sprouts, husks, and "screenings" are pelletized and shipped out in bulk for processing as animal feed.

Cleaned and graded barley is conveyed from storage bins in # 2 elevator to one of forty-five steep tanks for water absorption. The purpose of steeping is to raise the moisture content of the barley kernel. Each steep tank (cap. 6,000 bu.) is constructed of steel, and is set upon heavy structural steel frames which incidently brace the columns of each steep building. A concrete platform surrounding the upper part of each tank functions as an access floor for maintenance purposes.

equalization shall become exempt from assessment and taxation in the year 1970 and such property shall not be assessed or taxed for that year or for any year thereafter; provided, that this provision shall not apply to any property that is either subjected to a tax

which is imposed in lieu of ad valorem taxes or to any particular kind or class of personal property, including mobile homes or house trailers, that is subjected to a tax imposed pursuant to any other provision of law except as specifically provided in this subsection."

Steeped barley is conveyed by slurry pumps to one of twenty germinating compartments. A compartment (cap. 6,000 bu.) is essentially a large, rectangular, concrete box open on the top. The floor of each compartment is constructed of perforated metal trays which permit air to be drawn upward through the barley. The compartments are fitted with rails which support steel turning machines consisting of a row of spiral rotating helixes which travel the length of the compartment to level and periodically mix the germinating barley. The germinating compartments are divided into five units; each unit separated by a concrete wall for temperature and humidity control. These walls provide structural support for the roof above the malthouse.

Attemporators are large concrete enclosures which control and maintain the temperature and humidity conditions necessary to induce the germination of barley. Air temperature is initially controlled by the use of dampers which regulate the inflow of fresh air. Fans force air to circulate past water sprays which cool the air to the desired temperature, usually between 50 to 60 degrees Fahrenheit, and saturate it to 100 percent humidity. The air is channelled into a large concrete subcompartment located below each germinating compartment. Air is forced up through the perforated trays, is circulated through the growing barley, and is returned, by means of a large concrete air duct, to be recirculated by the fans or exhausted through dampers. Water utilized by the water sprays is chilled by four large refrigeration units. The heat removed from the water is transferred to cooling towers from which it is dispersed into the atmosphere.

When the germinating barley has reached the state of development desired, the resultant "green malt" is transferred to one of five kilns, which are large self-supported enclosures for heating and drying. The kilning process removes moisture from the malt, thereby terminating the growth process. The walls, floor, and roof of each kiln are constructed of concrete. Huge fans at the top of each kiln draw electrically-heated air up through three levels of perforated metal trays upon which the green malt is spread. The malt is first deposited in piles on the upper trays of the kiln. Louvered trays allow malt to be dropped through to the lower levels of the kiln at the appropriate stage in the drying process.

The malthouses and steep, attemporator, and kiln buildings were referred to collectively by William Meyer, Executive Vice President of the firm responsible for the design and construction of the Ladish plant, as the malthouse. He testified that the malthouse is "just an industrial process that has a great deal of equipment in it ... [a]nd part of the equipment looks like a building." He testified that the outer shell or wall surrounding the malthouse, excluding the steep buildings, is constructed of concrete, a layer of insulation, and corrugated asbestos siding. The steep buildings are constructed of steel frame rather than concrete.

The roof and floors of the malthouse are also constructed of concrete. All heat in the malthouse is generated from the kilning or germinating process. Located beneath the steep tanks are rooms for control of the kilns and germinating compartments, electrical control, offices, small maintenance, parts storage, and an employee's lunchroom. Air conditioning is very minimal in the malthouse and is confined to office, lunchroom and control room areas. Plumbing for building needs is also minimal but very heavy for processing needs.

Finished malt is conveyed to one of two malt elevators (cap. 1,500,000 bu. each) to be aged and blended according to customer specifications. Aging is an organic process during which the moisture content in the finished malt stabilizes at a uniform level from the center of each kernel to its outer shell. The malt elevators contain rows of bins in which different types of malt are kept. After the aging process has been completed, the particular mix ordered by the customer is blended through a system of control gates which regulate the flow of various malts onto drag conveyors beneath

the bins. The malt is given a final cleaning en route to shipping bins from which it is weighed and loaded out into railcars for shipment to Ladish's customers.

The Spiritwood Township assessor, for the year 1981, determined the assessed value of the Ladish plant to be approximately $110 million. Ladish unsuccessfully appealed the assessment to the Spiritwood Township Board of Equalization and to the Stutsman County Board of Equalization pursuant to Sections 57–09–04 and 57–12–06, N.D.C.C. Ladish then appealed the assessment to the State Board of Equalization pursuant to Section 57–12–06(3), N.D.C.C. The State Board of Equalization retained a professional appraiser, Mr. Peter J. Patchin, who appraised the plant at $61 million, utilizing both the cost approach and income approach to value. On November 4, 1981, the State Board of Equalization, pursuant to Section 57–13–04(3)(a), N.D.C.C., heard testimony [2] and thereafter reduced the assessed 1981 valuation of the Ladish plant to $57 million:

"[T]he value of the Ladish malting plant ... [was] set by starting with Mr. Patchin's appraisal figure of $61 million and subtracting $4 million for incidental personal property and pollution control equipment, for a final value of $57 million for the structures and improvements only, excluding land." Proceedings of State Board of Equalization of North Dakota 1981, at 48–49.

Ladish received a "Lands Statement" from the Stutsman County Treasurer's Office for 1981 real estate taxes owed, based on a full and true value of $57 million for the plant and $126,100 for land. On December 21, 1981, Ladish filed an application for abatement and settlement of taxes with the Stutsman County auditor pursuant to Chapter 57–23, N.D.C.C. The governing body of Spiritwood Township passed a resolution on December 31, 1981, recommending to the Stutsman County Board of Com-

---

**2.** Testimony heard by the State Board of Equalization concerning the 1981 Ladish assessment has been summarized by the Tax Commissioner, in pertinent part, as follows:

"Mr. Peter J. Patchin, appraiser, reviewed the appraisal he had made of the plant using the cost approach and income approach to value and stated that his conclusion of value was $61 million.... Mr. Patchin stated that, under North Dakota law, he believed that basically the entire valuation as presented was taxable, with the possible exception of $4 million of pollution control equipment, which he felt should be tax exempt as a matter of public policy, even if the law was silent on the matter. Mr. Robert W. Wirtz, legal counsel, agreed that the entire property appraised was taxable, with some minor exemptions of perhaps $250,000 to $300,000 .... Mr. Barry Hasti, deputy state supervisor of assessments, stated that the barley receiving and storage elevator could possibly function without cleaning and grading equipment, which might therefore be subject to exemption under North Dakota law. Mr. Patrick Weir, attorney representing Ladish Malting Company, showed the Board pictures of some of the steep tanks, growing compartments, and kilns, which Ladish felt were clearly nontaxable equipment .... Mr. Weir continued that sugar beet plant equipment, which was considered tax exempt, was similar to equipment at the Ladish malting plant, which was being considered real property.... Mr. Kenneth M. Jakes, chief counsel, said that he thought

the Ladish plant was a structure and that he did not think that the items that were asserted to be personal property could be removed from within the plant without materially damaging or limiting the use of the structure. He added that North Dakota statutes contained no exemption for pollution control equipment but agreed with Mr. Wirtz that there could be a question of whether it added value to the property. Mr. Jim Brown, National Tax Services, Minneapolis, Mn., said that he had calculated the replacement cost of what he considered structures—the no. 1 kiln; nos. 2, 3, 4, and 5 kilns; and the malthouse, which included the steep buildings, the malthouse, and the attemporator building all in one structure. He did not include nos. 3 and 4 malt elevators because he considered them equipment, nor did he include other elevators that had been assessed previously.... With the inclusion of $2.8 million in land improvements, Mr. Brown arrived at approximately $17 million worth of taxable property. He stated that he did not disagree with the total value Mr. Patchin had placed on the plant, but he believed that virtually every piece of equipment in the buildings was personal property and tax exempt. Mr. Bill Meier, chairman of the Stutsman County Commission, said that the county would agree with Mr. Patchin's valuation." Proceedings of State Board of Equalization of North Dakota 1981, at 47.

missioners that the application be denied. The County Board of Commissioners, on January 5, 1982, rejected Ladish's application for abatement.

On January 27, 1982, Ladish appealed the decision of the Stutsman County Board of Commissioners, by service of a written notice of appeal upon the Board, to the District Court of Stutsman County pursuant to Sections 11–11–39 and 11–11–41, N.D.C.C. The trial judge and counsel for both parties were given a tour of the Ladish plant prior to trial. In its trial brief, the State argued that the Ladish plant is a structure built for a special purpose and that removal of the assets in dispute would materially limit or restrict the use of that structure, requiring a classification of the entire plant as real property under Section 57–02–04(2). Ladish conceded that a part of the plant, valued at approximately $14 million, is properly classified as real property; however, it argued that remaining property is personal property because it pertains to the use of structures and buildings.

Trial de novo was had as authorized by Section 11–11–43, N.D.C.C.[3] The district court heard testimony, received numerous exhibits, and on July 12, 1983, issued its findings of fact, conclusions of law and order for judgment. The following conclusions of law are pertinent to this appeal:

"4. The proper legal classifications pursuant to NDCC § 57–02–04 of plaintiff's physical assets are as follows:

| | Real Property | Personal Property |
|---|---|---|
| **BARLEY ELEVATORS** | | |
| STRUCTURE | $ 8,183,400 | |
| MACHINERY AND EQUIPMENT | | $ 1,979,193 |
| (as per 1979 Assessment) | | |
| | $ 8,183,400 | $ 1,979,193 |
| | | |
| **COMPARTMENTS A–E** | | |
| STRUCTURE | 5,458,931 | |
| SUPPORTING COMPONENTS | | 2,946,000 |
| TRAY FLOORS | | 519,774 |
| STEEP TANKS | | 900,458 |
| ATTEMPORATORS | 1,958,400 | |
| REFRIGERATION, COOLING TOWERS, FANS | | 1,370,238 |

| COMPARTMENTS A–E | Real Property | Personal Property |
|---|---|---|
| ELECTRICAL | | $ 930,127 |
| PIPING | | 1,469,941 |
| MISCELLANEOUS MACHINERY | | 1,310,275 |
| CONVEYORS, DUST COLLECTION EQUIPMENT | | 2,474,318 |
| | $ 7,417,331 | $11,921,131 |
| | | |
| **KILNS 1–5** | | |
| STRUCTURE | 3,858,404 | |
| SUPPORTING COMPONENTS | | 2,458,225 |
| HOPPERS | | 1,564,325 |
| ELECTRICAL | | 2,130,459 |
| FANS | | 404,525 |
| CONVEYORS | | 1,854,919 |
| TRAY FLOORS | | 1,180,380 |
| MISCELLANEOUS EQUIPMENT | | 1,140,758 |
| | $ 3,858,404 | $10,733,591 |
| | | |
| **MALT ELEVATORS** | | |
| STRUCTURE | $ 8,854,833 | |
| EQUIPMENT | | $ 3,958,306 |
| | $ 8,854,833 | $ 3,958,306 |
| | | |
| TOTALS | $28,313,968 | $28,592,221 |
| | (49.8%) | (50.2%) |

"5. All the personal property listed above are items which pertain to the use of the structures and buildings comprising the real property and are not constructed as an integral part of and are not essential for the support of such structures or buildings, and are removable without materially limiting or restricting the use of such structures or buildings.

"6. There is no legal basis for the notion of Taxpayer's facility as a 'special use facility' insofar as property tax classification is concerned.

"7. Accordingly, the correct legal assessment is $28,313,968, irrespective of land value. Taxpayer is entitled to a corresponding abatement of taxes and a refund for taxes paid for 1981.

"8. Taxpayer is not entitled to interest on its refund, but Taxpayer is entitled to its costs and disbursements incurred herein."

The State raises two issues on appeal:

(1) Did the district court err in its classification of assets subject to ad valorem taxation pursuant to Section 57–02–04, N.D.C.C., when it reduced the

3. Section 11–11–43, N.D.C.C., reads as follows:
"All appeals taken from decisions of a board of county commissioners shall be docketed as other causes pending in the district court and shall be heard and determined de novo."

fair market value for assessment purposes of the Ladish property from $57 million to $28,313,968?

(2) Assuming arguendo that some of the assets are exempt personal property, did the district court err in making adjustments to the assessment ·by starting with a total plant value of $57 million instead of $61 million?

Ladish raises the following issues in its cross-appeal:

(1) Did the district court err by not reducing the assessment to $14,483,052?

(2) Is Ladish entitled to a pro rata share of interest earned on 1981 tax payments paid under protest and placed by order of the district court in an interest-bearing account?

We have been asked to resolve the property classification issue by construing Section 57–02–04(2). The interpretation of a statute is a question of law, fully reviewable by this Court. *See Feiler v. Wanner*, 340 N.W.2d 168, 169 (N.D.1983). Thus, in cases involving the taxable status of property we independently construe the statutory provisions involved. *See United Power Association v. Board of County Commissioners*, 300 N.W.2d 36, 38 (N.D. 1980); *Butts Feed Lots v. Board of County Commissioners*, 261 N.W.2d 667, 669 (N.D.1977); *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Comr's*, 219 N.W.2d 900 (N.D.1974); *Y.M.C.A. of N.D. State Univ. v. Board of County Com'rs*, 198 N.W.2d 241 (N.D.1972).

The arguments raised before this Court concerning the correctness of the construction and application of Section 57–02–04(2) are identical to those raised before the district court. The State argues that the Ladish malting plant is a special purpose property because of its use for a unique function and its distinctive, specially-designed structural detail. It is argued that removal of any of the disputed property would ma-

terially limit or restrict the use of the plant. Ladish argues that the correct assessed value of its plant is $14,483,052, exclusive of land, as detailed below: [4]

| | |
|---|---|
| "Barley Elevators (# 1 and # 2) | $8,183,400 |
| Malthouse (structural walls, floors and roof only) | 2,824,992 |
| Kilns (structural walls, floors and roof only) | 2,265,145 |
| Train Shed | 190,343 |
| 6" Concrete Slab | 160,848 |
| R.R. Spur | 73,380 |
| Cleaner Building | 351,265 |
| Clean Water Pump House | 9,501 |
| Waste Water Pump House | 54,914 |
| Water Reservoir | 87,332 |
| Storage Tanks (Finished Malt) | 209,932 |
| 'Texas' Over Malt Elevators | 72,000 |
| TOTAL: | $14,483,052" |

Ladish interprets the definition of real property in Section 57–02–04(2), to include structures and buildings and to exclude items which pertain to the use of such structures and buildings. It argues that each item in dispute is industrial processing machinery or equipment which pertains to the primary use of its malting plant, i.e., the transformation of barley into malt.

In our role of determining the meaning of statutes, the primary objective is to ascertain the intent of the legislature. *Rheaume v. State*, 339 N.W.2d 90, 92 (N.D. 1983). This Court has recognized that words describing the object of a tax exemption will be given a liberal and not a harsh or strained construction to obtain a reasonable result effectuating the legislative intent in providing a tax exemption. *Mills v. Board of County Commissioners*, 305 N.W.2d 832, 836 (N.D.1981). The legislative intent must first be sought from the language of the statute; however, if a tax statute is ambiguous so that the legislative intention with respect to the meaning of the statute is doubtful, the doubt must be resolved in favor of the taxpayer. *Geo Resources, Inc. v. Tax Commissioner*, 288 N.W.2d 54, 55 (N.D.1980).

4. Ladish's basis for this reduction of the assessed value of its plant is a determination of the plant's market value by James Brown, President of a property tax consulting firm, calculat-

ed by deducting depreciation from the current replacement costs of items considered by Brown to be real property.

A perusal of Section 57–02–04(2) reveals that the statute clearly expresses the legislative intent to include, within the definition of real property, all structures and buildings, the heating, air conditioning, ventilating, sanitation, lighting, and plumbing systems of such structures and buildings, and all rights and privileges thereto belonging or in anywise appertaining. We find that the statutory language which excludes certain items from the definition of real property is susceptible to different meanings; however, it is clear that machinery and equipment used for trade or manufacture is not excluded from the definition of real property for the sole reason that it pertains to the use of structures and buildings. The remaining language of Section 57–02–04(2) must also be considered.

Section 1–02–39, N.D.C.C., reads as follows:

> "If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:
>
> 1. The object sought to be attained.
> 2. The circumstances under which the statute was enacted.
> 3. The legislative history.
> 4. The common law or former statutory provisions, including laws upon the same or similar subjects.
> 5. The consequences of a particular construction.
> 6. The administrative construction of the statute.
> 7. The preamble."

The legislature's objective and the circumstances surrounding the enactment of Section 57–02–04 are revealed by the statute's legislative history. Section 57–02–04 was a product of a 1971 interim committee study on the North Dakota tax structure, including the classification of property for purposes of property tax assessment. Report of the Legislative Council, Forty-second Legislative Assembly, Finance and Taxation 1971, at 54. A review of the Report of the Legislative Council reveals that the legislature's repeal, in 1969, of the personal property tax resulted in numerous inequities and an absence of uniformity regarding the assessment of certain classes of property, particularly fixtures and industrial equipment.

The interim committee reviewed the statutes and case law of other states for the purpose of finding an equitable and uniform manner in which to classify property for purposes of taxation. Reviewed were (1) a "material injury" theory followed in New Jersey wherein personal property was defined so as to exclude goods and chattels so affixed to real property as to become a part of the real property and not to be severable or removable without material injury thereto; (2) the "movability" test; specifically, a New York statute defining real property for tax purposes which excluded "movable machinery or equipment consisting of structures or erections to the operation of which machinery is essential, ... used for trade or manufacture and not essential for the support of the building, structure or superstructure, and removable without material injury thereto" as construed in *City of Lackawanna v. State Bd. of Equal. & Assess.*, 21 A.D.2d 318, 250 N.Y.S.2d 369 (1964); and (3) a rule adopted by the Supreme Court of Pennsylvania in *In re Borough of Aliquippa*, 405 Pa. 421, 175 A.2d 856 (1961), regarding the assessment of industrial equipment wherein real and personal property were distinguished on the basis of whether the property in question pertains to the manufacturing process or to the building in which the property is located.

The committee's recommendation is discussed in the Report of the Legislative Council as follows:

> "Following extensive review and discussion of classification problems, the committee recommends a bill which would redefine real property to include, basically, only the land itself and buildings.... The definition of buildings ... would not include items which pertain to the use of such buildings, such as machinery or equipment used for trade or manufacture, which are not constructed as an integral part of and are not essen-

tial for the support of the buildings, and which are removable without materially limiting or restricting the use of such buildings.

*"The committee recognizes that the bill which it recommends would remove most items of property from the tax rolls which fall into that questionable area between real and personal property, such as industrial machinery and equipment. However, the view was expressed that this had been the intention of the last legislature in repealing personal property taxes, and that anything short of removing all items of property which come under the two clear classifications would result in continuing inequities in taxation. The committee is also aware that some political subdivisions rely heavily upon certain large industries the machinery and equipment of which supply a large portion of the tax base. The solution to these problems, it was concluded, lies in alternative methods of taxing certain industries, such as sugar beet plants and oil refineries, rather than continuing to assess such property as real estate."* Report of the Legislative Council 1971, at 55. [Emphasis added.]

The result of the interim committee's study was Senate Bill No. 2045. The legislative history reveals that a conference committee amended the bill by including the word "structures" wherever the word "buildings" occurred in the bill so as to include within the definition of real property such items as tanks, bulk plants and

storage or manufacturing equipment not enclosed in a building. The bill as enacted included within the definition of real property "machinery and equipment ... used or intended for use in any process of refining products from oil or gas extracted from the earth ... [and] sugar beets." 1971 N.D. Sess.Laws, Ch. 534.[5]

■ The administrative construction of an ambiguous statute also serves as an extrinsic aid in determining legislative intent. In 1971 the Office of State Tax Commissioner issued guidelines for the classification of property for tax purposes, a copy of which was received as an exhibit at trial. Although plain terms of a statute may not be contradicted by an administrative interpretation thereof, the practical construction by the Tax Commissioner of an ambiguous statute is entitled to some weight in construing the statute. *In re Dilse,* 219 N.W.2d 195, 200 (N.D.1974); *State Tax Commissioner v. Tuchscherer,* 130 N.W.2d 608, 615 (N.D.1964).

The Tax Commissioner's guidelines profess to promote uniformity in the classification of property in accordance with Section 57–02–04. Indeed, the guidelines are written in mandatory language; requiring all duly elected and appointed assessors to use the guidelines in classifying property or face the possibility of reassessment by the Tax Commissioner.[6] The guidelines include definitions of the words "structure" and "building" for use by the assessor in classifying property.[7] All structures and

5. Machinery and equipment used or intended for use in any process of refining products from sugar beets is no longer specifically included within the definition of real property under Section 57–02–04(3). 1979 N.D.Sess.Laws, Ch. 587.

6. The State Tax Commissioner is authorized by Section 57–01–02(7), N.D.C.C., to "require a reassessment of property in any county to be made in accordance with chapter 57–14, whenever that is deemed necessary...." General supervision by the Tax Commissioner "over all assessors of general property or other taxes, ... in the performance of their duties, to the end that all assessments of property be made relatively just and equal in compliance with the

laws of the state" is required by Section 57–01–02(2), N.D.C.C.

7. The word "structure" is defined in the Tax Commissioner's guidelines, in pertinent part, as follows:

"A 'structure' is anything constructed or erected from an assembly of materials, which requires a permanent location on or in the ground or is attached to something having permanent location on or in the ground. It includes, but is more general, than the term 'building'...."

The definition of the word "building" reads as follows:

"A 'building' is a structure designed to stand permanently, and covering a space of land,

buildings are required to be assessed as real property. The word "structure" is defined, in part, to not include "attached machinery and equipment used in the operation of a business or industrial building." The following paragraph from the guidelines is also pertinent:

"Items to be included as a building or structure are the central heating system, air conditioning, ventilation, sanitation, lighting and plumbing which are part of the building. With the exception of machinery and equipment used or intended to be used in the process of refining products from oil or gas extracted from the earth, ... *all other attached machinery and equipment is classified as personal property and is thereby exempt from property taxation.*" [Emphasis added.]

Specific items of property are set forth in the Tax Commissioner's guidelines along with corresponding classifications as real or personal property for tax purposes. Under the heading "Commercial Grain Elevators", attached transfer equipment (an integral part of the building or structure) and grain storage tanks and silos (an integral part of the building or structure) are classified as real property. Scales, hoists (truck), cleaning equipment, pelleting equipment, and air compressors are classified as personal property. Under the heading "Industrial Plants", assembly lines, blast furnaces, boilers (not for heating the building), vats, refrigeration equipment (not for air conditioning the building), and processing equipment are classified as personal property. Although the guidelines exclude most attached machinery and equipment from assessment and taxation, the words "machinery" and "equipment" are not specifically defined nor is specific reference made to items of property contained in malting plants. It is interesting to note, however, that many of the specific items classified in the guidelines as real property are expressly limited to those

which is enclosed by walls and is covered with a roof. In normal use the word 'building' includes the whole structure, the basement as well as any addition, and is used as a

items which are integral parts of the building or structure, or those items the removal of which would cause material injury to the property.

 It is our view, in light of the interpretative aids discussed, that the intent of the statute is to define real property for tax purposes so as to exclude those items (1) which pertain to the use of structures and buildings (such as machinery or equipment used for trade or manufacture), *and* (2) which are not constructed as an integral part of and are not essential for the support of such structures or buildings, *and* (3) which are removable without materially limiting or restricting the use of such structures or buildings. Thus, an item which pertains to the use of structures and buildings should be classified as personal property only if it is not constructed as an integral part of and is not essential for the support of structures or buildings and is removable without materially limiting or restricting the use of structures or buildings.

What property constitutes items "which pertain to the *use* of such structures and buildings"? As earlier noted, the Report of the Legislative Council refers to a rule adopted by the Supreme Court of Pennsylvania in *In re Borough of Aliquippa, supra*, 175 A.2d at 859–62. In *Aliquippa* the court construed a statute which excluded "[m]achinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment... as a part of the real estate in determining the value" thereof for tax assessment purposes. At issue was the application of the statute to a steel mill, the operation of which, in order to convert the raw materials of coal and iron into steel, necessitated the use of large, heavy equipment securely anchored with solid foundations.

The borough argued that the legislature intended to adopt the common law doctrine

dwelling, warehouse, storehouse, factory, shelter for animals, or some other useful purpose."

of fixtures in the determination of what is real estate for tax purposes. The court rejected the argument that physical attachment should be the distinguishing characteristic in determining what is real and what is personal property for tax purposes. The court construed the statute as follows:

> "[U]nder the statute involved, improvements, whether fast or loose, which are used *directly* in manufacturing the products that the establishment is intended to produce and are necessary and integral parts of the manufacturing process and are used *solely* for effectuating that purpose, are excluded from real estate assessment and taxation. On the other hand, improvements which benefit the land generally and which may serve various users of the land, are not in this category. Neither are structures, which are not necessary and integral parts of the manufacturing process and which are separate and apart therefrom within the exclusion. A structure used for storage, for example, is part of the realty and subject to real estate taxation." *Aliquippa, supra,* 175 A.2d at 861–62 [Emphasis in original].

■ In light of the legislative history which we have earlier quoted, we find *Aliquippa* persuasive. Items which pertain to the use of structures and buildings are those items which are used directly in and solely for effectuating that particular purpose to which the taxpayer has employed its structures and buildings. In the instant case, items which are used directly in and solely for effectuating the transformation of barley into malt meet the first requirement that tax-exempt personal property "pertain to the use of such structures and buildings."

■ The State refers to that part of the statute: "items … which are removable without materially limiting or restricting the *use* of such structures or buildings" as the basis for a real property "subclassification for special purpose structures." To construe the word "use" as that particular use to which a taxpayer has employed its structures or buildings would not accommodate the legislative intent to exempt those items of property which fall into the questionable area between real and personal property, i.e., items such as industrial machinery and equipment. If items are used directly in and solely for effectuating that particular purpose to which the taxpayer has employed its structures and buildings, the removal of the items would naturally, in most instances, restrict or limit that particular use. Illustrative is testimony elicited at trial wherein the view was expressed that removal of disputed items from the Ladish plant would certainly prohibit the malting of barley. We construe the statute in a less restrictive manner. Items which are removable without materially limiting or restricting that quality of a structure or building that makes it useful or suitable for any purpose constitutes a construction more conducive to the legislative intent expressed. In other words, items which can be removed without rendering the structure or building nonfunctional, without extensive repair or redesign of the structure or building, and without replacement of removed items satisfy the requirement that personal property be "removable without materially limiting or restricting the use of such structures or buildings."

■ The word "removable" requires that the movability of property also be considered in determining whether an item is real or personal property for tax purposes. We realize that from a theoretical standpoint any structure or building ever built might conceivably be moved. As William Meyer succinctly stated at trial: "If you build it you can unbuild it." Without adopting that expansive a test, we construe this movability aspect of Section 57–02–04(2) to encompass both economic as well as physical considerations. *See City of Lackawanna v. State Bd. of Equal. & Assess., supra,* 250 N.Y.S.2d at 371. Where physical or economic considerations so negate movement as a matter of practicability, the property should be found to be real property. Here a reasonableness test must be applied.

The parties obviously have not had the opportunity to present argument concerning the proper classification of items constituting the Ladish plant in light of our interpretation of Section 57–02–04(2). It is quite clear from the record that the items disputed by the parties are used directly in and solely for effectuating the transformation of barley into malt and, as such, are integral parts of the malting process. However, testimony concerning the movability and consequences of removal of disputed items is limited.

Meyer testified that the grading, cleaning, and pelleting equipment utilized in # 2 barley elevator have a service life and could be removed from the elevator without *damaging* the outer building or structure. When asked how removal of such items could be accomplished, Meyer responded:

"A. Just detach it and depending on the size of the equipment, there are access openings and holes, and if there aren't, you take off a piece of siding ... take it [the equipment] out and put it [the siding] back on."

He testified further that siding on the barley elevator could be removed without damage to the elevator.

Meyer also testified that the steep tanks could be taken out and replaced without materially damaging the building or structure:

"A. ... If you want to use them [steep tanks] somewhere else, you are going to have to unbolt a portion of the roof and lift them out [by overhead crane], put the roof back on. And if you don't want to do that you can burn them up in pieces, make a little hole in the wall and shove them out."

He testified further that the unbolting and removal of a portion of the roof could be accomplished without damaging the structural integrity of the malthouse.

Meyer also testified that items utilized in the germinating compartments—turning, unloading and conveyance machinery—could be removed without materially damaging the structural integrity of the malthouse. He also testified that the kiln "plant" could be removed from the kiln shell without damaging that shell. "All the [kiln] floors could be taken out and the building could be used for a different purpose." The physical and economic practicability of removing the above items was not discussed, and there is no evidence in the record revealing the movability of other items in dispute.

Testimony was elicited by Ladish concerning alternative uses of its plant. James Klein, Vice President of operations for the Froedtert Malting Company testified that any malting plant could produce, without substantial changes, bulgur from wheat by utilizing the cleaning, steeping, kilning, and storage facilities of the plant. He testified that other grains, such as wheat or rye, can also be malted. Also discussed were the utilization of the plant's facilities to produce mushrooms or wheat gluten. There is no testimony, however, concerning purposes to which remaining structures or buildings could be put assuming movability and removal of the items in dispute.

■ It is clear that in light of our interpretation of Section 57–02–04(2), we are left with an inadequate record from which to resolve this matter.[8]

It is our view, in order to facilitate the proper deference to be accorded decisions of the Board of County Commissioners as articulated in *Shaw v. Burleigh County,* 286 N.W.2d 792, 796–97 (N.D.1979),[9] that

8. In our review of the district court's classification of items constituting the Ladish plant, we have found no basis in the record for distinguishing those items described as "structure" and "supporting components" or for distinguishing "attemporators" from "refrigeration, cooling towers, fans" in compartments A–E. Nor have we found a basis for the separate values and classifications accorded those items described as structure, supporting components, and hoppers in kilns 1–5. The appraisal report of Mr. Patchin does not distinguish these items.

9. In *Shaw v. Burleigh County, supra,* we discussed whether Section 11–11–43, by providing for de novo review of decisions of boards of

the Stutsman County Board of Commissioners must be given the opportunity to reconsider Ladish's application for abatement of the $57 million assessment in light of our clarification of Section 57–02–04(2) after a new and full hearing.[10]

Accordingly, the judgment of the district court is reversed and the order of the Board of County Commissioners is vacated pending the new hearing and order. Costs on appeal shall not be awarded either party.

VANDE WALLE, PEDERSON, GIERKE and SAND, JJ., concur.

county commissioners, was an unconstitutional delegation of a non-judicial duty to the judiciary to review legislative acts. At issue in *Shaw* was the propriety of the Board's decision to deny a special use permit pursuant to county zoning ordinances; a decision we deemed a legislative function subject only to appellate review to determine whether or not the Board, the county's legislative body, acted arbitrarily, capriciously, or unreasonably in reaching its decision. It is clearly not the function of the judiciary to act as a "super board of review." *See Barnes County v. Garrison Diversion Conservancy District,* 312 N.W.2d 20, 25 (N.D.1981); *Shaw, supra; Appeal of Johnson,* 173 N.W.2d 475, 482 (N.D.1970).

10. The parties may wish to make a verbatim record of the proceedings before the Board of County Commissioners.