2006 ND 118

**AMERICAN CRYSTAL SUGAR COMPANY, Applicant, Appellee, and Cross–Appellant**

v.

**TRAILL COUNTY BOARD OF COMMISSIONERS, Appellant and Cross–Appellee.**

**No. 20050343.**

Supreme Court of North Dakota.

June 1, 2006.

Wickham Corwin, Conmy Feste, Ltd., Fargo, ND, for applicant, appellee, and cross-appellant.

Jon J. Jensen (argued), Pearson Christensen Cahill & Clapp, P.L.L.P., Grand Forks, ND, and Stuart A. Larson, Hillsboro, ND, for appellant and cross-appellee.

MARING, Justice.

[¶ 1] The Traill County Board of Commissioners appealed from a district court memorandum opinion and order[1] reversing some of the Board's determinations in a tax abatement proceeding brought by American Crystal Sugar Company ("American Crystal") in an attempt to have its property tax liability lowered for a sugar factory located seven miles north of Hillsboro. American Crystal cross-appealed, challenging parts of the court's ruling that denied it further tax relief. We affirm in part, reverse in part, and remand for further proceedings.

I

[¶ 2] American Crystal operates a large sugar factory in Traill County that processes sugar beets into refined sugar. Originally constructed in 1973, the Hillsboro plant's capacity was significantly increased by an expansion project completed in 1999. In 2000, an additional processing capability known as molasses desugarization ("MDS") was added to the facility. The district court described the plant's operations:

Trucks deliver the harvested beets to a wet hopper where the beets are water jetted or floated into the factory. Large equipment is then used for removing rocks, large chunks of mud, and also for doing initial washing to try to remove more of the mud that has adhered to the beets. From there, the beets go into the factory to what is called the extraction side. It is here where the washed beets are sliced like shoestring potatoes and then go into what is called the defusion or extraction process. There, hot water, pressure and time is used to separate the sucrose or the sugar from the fiber itself. The pulp itself then goes to the pulp drying or a pelletizing station.

---

1. Because the memorandum opinion and order was clearly intended to be final, we treat it as an appealable final judgment. *See, e.g., Austin v. Towne,* 1997 ND 59, ¶ 7, 560 N.W.2d 895.

This is where the pulp is pressed to dry and to extract the sugar from it. From there it goes to large, rotating dryers where the pulp is then separated. It then goes into pelletizing. From there it goes to a pellet storage bin. Pellets are then loaded to rail cars and shipped to customers as a byproduct.

The juice stream itself then goes into what is called the purification infiltration. Equipment consisting of vessels, pipes, and pumps that run through the factory, transfer that juice stream. That juice is mixed with lime and carbon dioxide in vessels. Then in reactors, the nonsugars are removed from the juice stream so that a much purer sucrose laden juice stream continues on in the factory.

From there, the juice goes to the evaporation station. These are large vessels where steam is used to drive off the water and thicken the juice.

The crystallization process is next. The plant uses a three-stage system where it boils and crystalizes the juice three times to extract as much sugar as economically feasible. It boils the juice under a vacuum at low temperature and initializes crystal growth. The crystals then go to centrifuges where the sugar crystals are separated from the mass or the juice. The crystals go to silos. The molasses goes to a storage tank. That molasses is held until it goes to the MDS plant where the molasses is further processed into an extract.

[¶ 3] On October 30, 2003, American Crystal applied for tax abatements for its Traill County property for tax years 2001 through 2003. Traill County had assessed the value of the property to be $27,746,143 for 2001; $27,092,238 for 2002; and $26,710,981 for 2003. American Crystal requested that the property tax value be reduced to $12,375,671 for 2001;

$10,892,934 for 2002; and $17,222,233 for 2003. At the two-day hearing before the Board of Commissioners in January 2005, American Crystal raised several new issues that were not included in its applications for abatement. American Crystal claimed the property tax value of the plant for each of the three contested years was $5,700,000. American Crystal claimed some of the structures on the plant were being taxed as real property but should have been classified as personal property and excluded from taxation. American Crystal also challenged the Board's classification of the 695.7 acres of land upon which the plant is located as commercial property rather than agricultural property. Following the hearing, the Board denied American Crystal's applications for abatement.

[¶ 4] On appeal, the district court ruled the Board's decision to accept the "trended cost" method for valuing the property was not arbitrary, capricious, or unreasonable; the Commissioners' decision to include American Crystal's beet storage sheds or freezers and extract tanks in the taxable real property valuation was correct; and the Board's hearing process did not violate American Crystal's due process rights. The court, however, further ruled the Board incorrectly included American Crystal's conditioning silos as taxable real property and ordered that the land upon which the plant is located be reclassified as agricultural property rather than as commercial property and the valuation of the property be modified accordingly. These appeals followed.

II

[¶ 5] We set forth the standard of review for appeals under N.D.C.C. §§ 11–11–43 and 28–34–01 in *Dakota Northwestern Assocs. Ltd. P'ship v. Burleigh County Bd. of County Comm'rs*, 2000

ND 164, ¶ 8, 616 N.W.2d 349 (citations omitted):

> Our review of a local governing body's assessment of value for tax purposes is limited by the doctrine of separation of powers. Taxation of property is a legislative function, not a judicial function, and courts may not substitute their judgment for that of the local governing body. A reviewing court may not reverse the Board's decision simply because it finds some of the evidence more convincing; rather, the reviewing court may reverse only where there is such an absence of evidence or reason that the Board's decision is arbitrary, capricious, or unreasonable. A decision of a local governing body is arbitrary, capricious, or unreasonable only if it is not the product of a rational mental process, by which the facts and the law are considered together for the purpose of achieving a reasoned and reasonable interpretation.

Our scope of review is the same as the district court's, and we independently determine the propriety of the local governing body's decision without according special deference to the district court's review. *Ennis v. Williams County Bd. of Comm'rs*, 493 N.W.2d 675, 679 (N.D.1992).

### A

[¶ 6] American Crystal argues the Board's hearing process denied it due process. American Crystal complains that it was required to present its evidence and final summation before Traill County presented its case, and was not allowed to cross-examine witnesses. American Crystal also argues the Board was influenced by newspaper accounts and general public opposition to its requested tax relief. The ultimate result, according to American Crystal, was that the Board, in denying its requests for abatements, showed more concern for preservation of the county's tax base and political considerations, rather than notions of justice and fair play.

[¶ 7] Due process is flexible and must be analyzed on a case-by-case basis, balancing the competing interests and assessing whether the basic due process requirement of fairness has been satisfied. *Gray v. North Dakota Game and Fish Dept.*, 2005 ND 204, ¶ 28, 706 N.W.2d 614. This Court has long held that the taxation of property is a legislative rather than a judicial function. *See, e.g., Ulvedal v. Board of County Comm'rs*, 434 N.W.2d 707, 709 (N.D.1989); *Appeal of Johnson*, 173 N.W.2d 475, 481–82 (N.D.1970). Because a board of county commissioners is not a judicial tribunal, "'due process does not require a judicial trial, and the character of the hearing is not measured by standards of judicial procedure.'" *First American Bank & Trust Co. v. Ellwein*, 221 N.W.2d 509, 514 (N.D.1974) (quoting *Brinkley v. Hassig*, 83 F.2d 351, 356 (10th Cir.1936)). Consequently, courts have refused to invalidate local government tax assessment proceedings on due process grounds based on arguments that a particular governing body failed to follow rules applicable to judicial proceedings. For example, in *County of Ramsey v. Lincoln Fort Rd. Hous. Ltd.*, 494 N.W.2d 276, 281 (Minn.1992), the court held civil discovery procedures were not applicable to proceedings for collection of delinquent taxes. In *In re Owens*, 144 N.C.App. 349, 547 S.E.2d 827, 831 (2001), the court held the taxpayers were not denied due process when the taxpayers were required to present their case first, after which the County advanced a method of valuation different than the method the taxpayers anticipated. In *Town of Vienna v. Kokernak*, 612 A.2d 870, 874 (Me.1992), the court rejected a due process challenge to denial of the opportunity to cross-examine witnesses at a hearing, reasoning "[i]t is unnecessary to

import into the county commissioners' hearing all those safeguards of a court proceeding in order to meet the requirements of due process."

[¶ 8] The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Ellwein*, 221 N.W.2d at 517; *Owens*, 547 S.E.2d at 831. Whether a party has been deprived of due process by an action of a nonjudicial body "depends on whether it acted contrary to the statutes and rules and with arbitrary and unreasonable discrimination." *Williams Elec. Coop., Inc. v. Montana–Dakota Util. Co.*, 79 N.W.2d 508, 523 (N.D.1956). Judicial review is the ultimate due process protection accorded persons aggrieved by the decisions of local government bodies or administrative agencies. *See Sletten v. Briggs*, 448 N.W.2d 607, 610 (N.D.1989).

[¶ 9] We are not persuaded by American Crystal's argument that the Board's alleged bias denied it due process. *See, e.g., Ellwein*, 221 N.W.2d at 513 (rejecting due process challenge to hearing that was allegedly "designed in the great tradition of the Old West to be a fair trial before the hanging"); *Hilltop Basic Res., Inc. v. County of Boone*, 180 S.W.3d 464, 470 (Ky.2005) ("despite the members' preexisting opinions regarding the community effects of subsurface mining in general, we find nothing in the record which indicates that these members did not seriously or honestly consider Hilltop's proposal"). We agree that "[g]eneral policy-based controversies such as these are best ferreted out in the legislative arena, i.e., through expression of the will of the voters in the electoral process." *County of Boone*, 180 S.W.3d at 470.

[¶ 10] American Crystal was given an opportunity to present evidence at a meaningful time and in a meaningful manner. The Board was not required to follow formal rules of judicial procedure in the tax abatement proceedings. We conclude American Crystal's due process rights were not violated by the hearing procedure used in this case.

B

[¶ 11] American Crystal argues the Board acted arbitrarily and unreasonably in rejecting its proposed method of valuating the real property.

[¶ 12] For tax assessment purposes, property must be valued at its "true and full value," *see Dakota Northwestern*, 2000 ND 164, ¶ 9, 616 N.W.2d 349; N.D.C.C. § 57–02–27.1, which is defined as:

the value determined by considering the earning or productive capacity, if any, the market value, if any, and all other matters that affect the actual value of the property to be assessed. This shall include, for purposes of arriving at the true and full value of property used for agricultural purposes, farm rentals, soil capability, soil productivity, and soils analysis.

N.D.C.C. § 57–02–01(15). A board of county commissioners may abate or refund, in whole or in part, any assessment or tax upon real property "[w]hen the assessment on the complainant's property is invalid, inequitable, or unjust." N.D.C.C. § 57–23–04(1)(h).

[¶ 13] "Appraisers generally use three approaches to get at fair market value: (1) analysis of comparable sales or market data; (2) analysis of the cost of replacement less depreciation; and (3) an income or economic analysis." *Mike Golden, Inc. v. Tenneco Oil Co.*, 450 N.W.2d 716, 719 (N.D.1990). *See also Midwest Processing Co. v. McHenry County*, 467 N.W.2d 895,

900 (N.D.1991); *Ulvedal,* 434 N.W.2d at 710 n. 3. The Traill County tax equalization director used the "trended cost" method to determine the value of the plant for tax purposes, a method the director has used since the plant was built in 1973. Under this method, the value is calculated by determining the replacement costs of the plant, and subtracting from that figure amounts for physical depreciation, functional depreciation, and economic depreciation. American Crystal's expert, John Coates, used the cost approach to market value based on computations from a facility located in Washington, the income producing approach to market value based on American Crystal's financial information, and the sales approach to market value based on relatively recent sales of plants in various states. American Crystal argued that Coates' method was more accurate than Traill County's "trended cost" method in arriving at the Hillsboro plant's actual market value, and under the "trended cost" approach, the Hillsboro plant was assessed many times higher than its actual market value.

[¶ 14] In its February 1, 2005, decision rejecting American Crystal's request for tax abatements, the Board explained:

> [American Crystal] stated that the method used in determining taxable valuation was not fair. [American Crystal] addressed the three methods of determining value: cost, sales and income. The Board of Commissioners decided that the cost method used by the Tax Director's Office was the only fair way the property could be valued. The current valuation is determined by a formula agreed upon by [American Crystal] and Traill County. The original cost of any property added to the tax rolls is provided by [American Crystal]. There have been adjustments to the formulas in past years, requested by [American Crystal], addressing obsolescent and economic depreciation (1987) and freezing the cost index for the main factory (1998), all favoring [American Crystal]. The [American Crystal] appraisal completed December 21, 2004 stated the cost value of all real property for 2001, 2002, and 2003 was $5,700,000 for each year. The Board of Commissioners decided that these numbers were not valid. The valuation for each year has to change due to depreciation so these numbers are estimates not facts. The Board of Commissioners determined that the appraisal was not tied to relevant numbers. The Board of Commissioners also questions whether this truly was an independent appraisal when the appraiser, Mr. Coates, testified he changed his numbers one month before completing the appraisal because [American Crystal] attorneys told him to.

> [American Crystal] testified that the sales method should be used to determine the value of the Traill County property. The Board of Commissioners decided that this method was invalid because some of the sales used were compelled sales.

> [American Crystal] testified that the income method was the least reliable method and should not be used. The Board of Commissioners agreed that while this is not the best method to use, it might have value because if the actual income could be determined, it may increase the value of the [American Crystal] property in Traill County.

[¶ 15] The appraisal of property for tax purpose is "far from an exact science." *Midwest Processing Co.,* 467 N.W.2d at 901 (VandeWalle, J., concurring specially). It is not our function "to micro-manage decisions of local taxing bodies in valuing property for tax assessment purposes." *Dakota Northwestern,* 2000

ND 164, ¶ 11, 616 N.W.2d 349. Rather, only when there is such an absence of evidence or reason as to amount to arbitrary, capricious, or unreasonable action, can we reverse a local governing body's assessment. *National Sun Indus., Inc. v. Ransom County*, 474 N.W.2d 502, 506 (N.D.1991). American Crystal has not cited, and we have not found, any case law condemning the "trended cost" method of valuation, and American Crystal does not argue that the "trended cost" approach is incompatible with the Tax Commissioner's guidelines for property tax valuation for residential or commercial property. It is obvious from the record that the Board had problems with Coates' credibility, and it was for the Board to assess credibility and give whatever weight it determined appropriate to his expert appraisal. *See Dakota Northwestern*, 2000 ND 164, ¶ 11, 616 N.W.2d 349.

[¶ 16] We conclude the Board did not act arbitrarily or unreasonably in rejecting Coates' appraisal and relying on Traill County's "trended cost" approach to valuation of the property.

### III

[¶ 17] The Board classified American Crystal's beet storage sheds or freezers, MDS extract tanks, and conditioning silos as real property subject to taxation. The Board argues the district court erred in ruling the conditioning silos were personal property not subject to taxation, and American Crystal argues the court erred in ruling the storage sheds or freezers and extract tanks were real property subject to taxation. Unlike a board of county commissioners' valuation of property, its classification of property as either real or personal presents a question of law fully reviewable by a court. *See Ladish Malting Co. v. Stutsman County*, 416 N.W.2d 31, 33–34 (N.D.1987) ("*Ladish II*").

[¶ 18] All property in this state is subject to taxation unless expressly exempted by law. N.D.C.C. § 57–02–03. Under N.D.C.C. § 57–02–08(25), locally assessed personal property is generally exempt from assessment and taxation. *See Ladish Malting Co. v. Stutsman County*, 351 N.W.2d 712, 713 (N.D.1984) ("*Ladish I*"). Personal property includes "all property that is not included within the definition of real property." N.D.C.C. § 57–02–05.1. For purposes of taxation, "real property" is defined in N.D.C.C. § 57–02–04 to include:

1. The land itself, ... and improvements to the land, ... and all rights and privileges thereto belonging or in anywise appertaining, and all mines, minerals, and quarries in and under the same....

2. All structures and buildings, including systems for the heating, air-conditioning, ventilating, sanitation, lighting, and plumbing of such structures and buildings, and all rights and privileges thereto belonging or in anywise appertaining, but shall not include items which pertain to the use of such structures and buildings, such as machinery or equipment used for trade or manufacture which are not constructed as an integral part of and are not essential for the support of such structures or buildings, and which are removable without materially limiting or restricting the use of such structures or buildings.

3. Machinery and equipment, but not including small tools and office equipment, used or intended for use in any process of refining products from oil or gas extracted from the earth, but not including such equip-

ment or appurtenances located on leased oil and gas production sites.

[¶ 19] In *Ladish I*, 351 N.W.2d at 721–22, this Court examined the legislative history of the statute and a Pennsylvania case referenced in that history, *In re Borough of Aliquippa*, 405 Pa. 421, 175 A.2d 856 (1961), in interpreting the meaning of N.D.C.C. § 57–02–04:

> [T]he intent of the statute is to define real property for tax purposes so as to exclude those items (1) which pertain to the use of structures and buildings (such as machinery or equipment used for trade or manufacture), *and* (2) which are not constructed as an integral part of and are not essential for the support of such structures or buildings, *and* (3) which are removable without materially limiting or restricting the use of such structures or buildings. Thus, an item which pertains to the use of structures and buildings should be classified as personal property only if it is not constructed as an integral part of and is not essential for the support of structures or buildings and is removable without materially limiting or restricting the use of structures or buildings.
>
> . . . .
>
> Items which pertain to the use of structures and buildings are those items which are used directly in and solely for effectuating that particular purpose to which the taxpayer has employed its structures and buildings.
>
> [I]tems which can be removed without rendering the structure or building nonfunctional, without extensive repair or redesign of the structure or building, and without replacement of removed items satisfy the requirement that personal property be "removable without materially limiting or restricting the use of such structures or buildings."

Where physical or economic considerations so negate movement as a matter of practicability, the property should be found to be real property. Here a reasonableness test must be applied.

Items which fall into the questionable area between real and personal property, such as industrial machinery and equipment, are not taxable. *Ladish I*, 351 N.W.2d at 720.

## A

[¶ 20] The Board argues the district court erred in concluding American Crystal's conditioning silos constituted personal property exempt from taxation.

[¶ 21] American Crystal has three conditioning silos, also known as Weibull silos, named after their Swedish inventor, Nils Weibull. They are freestanding structures that receive from conveyors and hold uncured sugar emerging from the crystallization process until the sugar is packaged. Lloyd Kennedy, American Crystal's factory manager, explained:

> [The conditioning silos] are an integral part of the process. If they were not there we would have a very difficult time selling our sugar from a customer standpoint, whether it's industrial or consumer, based on the fact that the sugar is not ready to be sold. It needs to be conditioned for a minimum of 72 hours to cool and to further remove moisture that's trapped in the crystal. Also as we store that in these [sic] equipment it has to be maintained at a temperature and humidity to prevent condensation and attracting more moisture as it goes, plus from a safety standpoint if it gets too dry it does become explosive.
>
> . . . .
>
> Just to explain how it works, sugar from the process comes from the top and is conveyed out to the top of the silo where it's distributed by a sprinkler sys-

tem that falls down. It has leveling equipment that convey the sugar. If you didn't convey it out, it would pile up in the middle of the bin and you essentially would have—not be able to control the temperature of it. So it levels it out, pushes it out to the side to maintain a depth of sugar, you know, 6 inches at a time.

So when it's level the air that circulates around the bin is—you can't see it here, but there's actually ducting on the outside walls, and that's done to maintain the temperature because you have hot sugar inside, cold temperatures outside, just like your house, you'd have condensation in weather like this, you get water inside, and it would essentially become a large lump of sugar. So the air above the head space is heated from below and maintained at a temperature. Humidity inside the bin is controlled to drive off excess humidity and also to prevent it from getting too low.

So as it's filled, that's how it's done, but when it's retrieved the same equipment actually conveys the sugar back to the center of the bin in layers, brings it back, and then it's conveyed out to whether it goes to our rail car loading or to our packaging plant where it's put in bags.

And, like I mentioned, our conditioning, our policy is that it has to maintain a minimum of 72 hours. Anything less than that we run the risk of getting customer complaints. And that's one of the most prevalent complaints we get if it's not conditioned properly is hard, lumpy sugar, whether it's consumer or from industrial producers.

[¶ 22] In *Ladish I*, 351 N.W.2d at 722, this Court, quoting from *Aliquippa*, 175 A.2d at 861–62, stated that " '[a] structure used for storage, for example, is part of the realty and subject to real estate taxa-

tion.' " The Board argues that the conditioning silos should be classified as real property subject to taxation because they "are simply sophisticated storage structures used for holding the sugar before it is packaged and shipped to customers." We reject both the Board's argument that the conditioning silos are subject to taxation in their entirety and American Crystal's argument that the structures in their entirety are personal property not subject to taxation.

[¶ 23] Kennedy's testimony clearly establishes that the sprinkler system, the leveling equipment, and the temperature control system contained within the structures of the conditioning silos are items used directly in and solely for effectuating the process of converting sugar beets into sugar that is marketable. We do not believe Kennedy's testimony establishes that the bin structures themselves are items used directly in and solely for effectuating the process. Although the Weibull silos are purchased as a unit, the evidence reflects that the bins themselves would not effectuate the conditioning of the sugar if it were not for the special equipment attached to the bins. In *Ladish I,* 351 N.W.2d at 720–21, we noted that the Tax Commissioner's guidelines required that "[a]ll structures and buildings are required to be assessed as real property" and that " *'all other attached machinery and equipment is classified as personal property and is thereby exempt from property taxation.'* " *See also Ladish II*, 416 N.W.2d at 36 (miscellaneous machinery and equipment located in barley elevators constituted personal property not subject to taxation); *FACS of New Ulm, LLC v. County of Brown*, 2001 WL 579058, *3 (Minn.Tax 2001) (refrigeration equipment contained in structure was personal property exempt from taxation). We are not persuaded that the physical structure of the bins

themselves are so highly specialized that they are integral, functional and inseparable parts of the industrial process. *See BFC Hardwoods, Inc. v. Board of Assessment Appeals of Crawford County*, 565 Pa. 65, 771 A.2d 759, 767 (2001) (dry kilns are comparable to the shells or chambers of an oven and are inseparable parts of items of machinery or equipment). Although Kennedy testified the conditioning silos have no practical alternative use, we are not convinced that the silos, without the attached equipment, would have any fewer alternative uses than the structure of the barley elevator absent its equipment that we upheld as taxable in *Ladish II.* Consequently, we conclude that the sprinkler system, the leveling equipment, and the temperature control system are items that "pertain to the use of structures and buildings" and satisfy the first prong of the three-part test under *Ladish I*, 351 N.W.2d at 721.

[¶ 24] We further conclude that these items of equipment are not an integral part of and are not essential for the support of the silos or other structures on the site and that they are removable without materially limiting or restricting the use of the structures. The record does not suggest that the "roof and siding [of the structures] ... would collapse if the inner machinery were removed." *United States Steel Corp. v. Board of Assessment and Revision of Taxes of Bucks County*, 422 Pa. 463, 223 A.2d 92, 97 (1966). Kennedy explained that "all the equipment inside [the conditioning silos] could be removed and reused."

[¶ 25] We conclude the items of equipment in the conditioning silos used for effectuating the process of converting the sugar into a marketable sugar product, as opposed to the basic structures, are personal property not subject to taxation.

## B

[¶ 26] American Crystal argues the district court erred in concluding the MDS extract tanks constitute real property subject to taxation.

[¶ 27] American Crystal has three free-standing extract tanks that contain extract that is formed through the molasses desugarization process. Because the factory does not have sufficient capacity to process the extract into sugar until the primary slicing campaign has ended, those tanks store the molasses extract until it can be processed. Kennedy explained:

The extract storage tanks are the tanks to the north of the facility. They look like large storage but, there again, they're an intermediate process. The molasses that is processed at our molasses desugarization plant is not a final product. It goes into those vessels where, again, it has to be stored for long period of times [sic]. From—basically from mid-August till we start processing in mid-May we have about 21 million gallons of extract for the factory to process.

It's different from molasses. The molasses is pretty easy to store because of low purities, which means the percent sugar or the purity of sugar in the juice. Extract storage is a process. It has to be maintained at a certain pH, a certain temperature, you got to prevent moisture from getting in there to prevent spoiling of the juice because if it starts spoiling we won't recover the sugar out of it. So it's stored there until it can be crystallized in the factory. It's stored for extended period of times at a certain temperature. And the atmosphere, the air above it, you can see the heat exchangers and the air handling equipment for maintaining the temperatures in those bins are mounted on the outside with the large pipes going to the top of

the tanks. So that's all controlled and maintained throughout the process.

[¶ 28] Based on our analysis of the conditioning silos, we likewise conclude the basic structures of the extract tanks are subject to taxation as real property, but the associated equipment used to prevent the extract from spoiling is personal property not subject to taxation. *See Ladish II,* 416 N.W.2d at 36. Kennedy testified the temperature and the pH level in the tanks are controlled by heat exchangers and air handling equipment. This equipment that preserves the extract so it can be processed into marketable sugar constitutes items used directly in and solely for the purpose of producing sugar, and, as such, pertains to use of the structures. As with the conditioning silos, the physical structures of the extract tanks are not so highly specialized that they have no alternative use at the factory. The record does not suggest that the equipment associated with the tanks was constructed as an integral part of and is essential for support of the structures. Furthermore, the description of the equipment indicates it would be removable without limiting or restricting the use of the structures. The equipment associated with the extract tanks, therefore, meet the definition of personal property not subject to taxation.

### C

[¶ 29] American Crystal argues the court erred in failing to conclude the beet storage sheds or freezers are personal property not subject to taxation.

[¶ 30] American Crystal has three freestanding sugar beet storage sheds or freezers that are designed to allow the factory to continue to operate until all of the beets harvested in a typical year can be processed. Kennedy explained:

[T]he beets are put in there and we use the ambient or cold weather like this to freeze the beets down to well below freezing basically in a large chunk, and they need to stay in that state until they're processed. If they thaw out they pretty much immediately turn to mush and they're no longer—we're no longer able to process those beets in the facility. So they got to be maintained there, especially in the month of May. They're frozen down rapidly and maintained there for the whole duration.

These are specially designed freezers. They take the air—and I'll show you a schematic here in a minute of how they actually work. Once they're frozen down they're actually covered with insulation inside those to help keep the temperature down and keep the beets frozen until we actually can process them. They are used exclusively to extend the duration of the campaign at all of our facilities and specifically, in this case, Hillsboro.

This is an end view of one of the freezers. This would be the large door where trucks deliver the beets. But essentially this is a large air plenum. On both sides we have the option to bring in outside air or inside air drawn through computer-controlled fans to maintain the temperatures inside. Those are ducted underneath through the floor in about 10–foot spacing. That is pushed up through the beets and vented out the top ducts. Like if you drove out there now, you'd see a lot of steam being driven off. That's because the beets are in the process of being frozen. When they're frozen everything's shut down, they're sealed up, and maintained at that temperature until we open them up in the spring of the year to start processing.

[¶ 31] We do not view the sugar beet sheds or freezers any differently than the conditioning silos or the extract tanks. Al-

though the basic structure of the freezers constitute real property subject to taxation, the associated equipment designed to keep the beets in condition to be processed into sugar at a later time must be classified as personal property exempt from taxation. Without the associated equipment, the beets stored in the structures could not be processed. This equipment is used directly in and solely for effectuating the purpose of processing beets into sugar, and therefore, the equipment pertains to the use of the building. The equipment is not constructed as an integral part of the structures and is not essential for support of the structures. Furthermore, the equipment is removable without materially limiting or restricting the use of the structures. Kennedy testified the structures could also be used as general storage facilities. Consequently, we conclude the equipment associated with the beet storage sheds or freezers are personal property not subject to taxation, but the basic structures are subject to taxation.

D

[¶ 32] During the proceedings, the Board took the position that the conditioning silos, the extract tanks, and the beet storage sheds or freezers were subject to property taxation in their entirety, without differentiating between the equipment and the basic structures. American Crystal took the position that the conditioning silos and the extract tanks were exempt from taxation in their entirety, also without differentiating between the equipment and the basic structures. With regard to the beet storage sheds or freezers, American Crystal differentiated between the equipment and physical structures and asserted that the nontaxable personal property "accounts for about 45 percent of the original acquisition costs." We remand this case to the Board to reassess the value of this property minus the equipment which is

personal property exempt from taxation. It is within the Board's discretion to decide if it needs additional evidence to make the assessments.

IV

[¶ 33] The Board argues the district court erred in ordering that the land upon which the plant is located be reclassified as agricultural property rather than as commercial property. The Board contends the land was not classified as commercial property and, in any event, the distinction between agricultural and commercial property is irrelevant in this case because, under the "trended cost" method it used for valuation, classification of the land as either commercial or agricultural does not matter. American Crystal has not responded to the Board's assertions. Because the Board has provided no reason to upset the court's ruling on this apparent nonissue, we affirm that part of the judgment.

V

[¶ 34] We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

[¶ 35] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.